499 A.2d 1236

**Doris Ann FOSTER, a/k/a Nuketa Leah Ansara**

v.

**STATE of Maryland.**

**Nos. 43, 91, Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 12, 1985.

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, George E. Burns, Jr., Michael

R. Braudes, Asst. Public Defenders, Baltimore, on the brief), for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ELDRIDGE, Judge.

In February 1982, the defendant-appellant, Doris Ann Foster, was found guilty of felony murder by a jury in the Circuit Court for Cecil County. The defendant elected to be sentenced by the court, and, following a hearing, a sentence of death was imposed. On appeal, this Court held that certain evidence was erroneously excluded at trial, and we reversed the judgment and remanded for a new trial. *Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984).

Upon re-trial, a jury again found the defendant guilty of felony murder. This time Mrs. Foster elected to be sentenced by a jury, and, after a sentencing proceeding, the same jury determined that the sentence should be death. We shall affirm.

The evidence at the re-trial disclosed the following facts, essentially as set forth in the parties' agreed statement of facts pursuant to Maryland Rule 828 g. The body of Josephine Dietrich, the manager of the Maryland Manor Motel in Cecil County, was retrieved from the Chesapeake and Delaware Canal on May 23, 1981. An autopsy established the cause of death as seven stab wounds to the chest inflicted in rapid succession.

According to the testimony of Elizabeth Phillips ("Liz"), the defendant's daughter, sometime after 6:00 p.m. on January 29, 1981, Liz, her friend Tammy Rissler, and the defendant began consuming beer and a drug referred to as

"crank." As the defendant drove them along Route 40 in Delaware and Maryland, the defendant said that she needed three people to rob a woman. Tammy insisted upon being let out of the car and was then let out. Next, the defendant and Liz proceeded to the Maryland Manor Motel, where the defendant and her husband, Tommy Foster, resided. In the Fosters' motel room they drank more beer, and Mrs. Foster described a plan to rob Mrs. Dietrich. The defendant Foster said that she was going to go to Mrs. Dietrich and tell her that she heard noises. The defendant then went into the bathroom and returned with a screwdriver in her hand. She and Liz went to Mrs. Dietrich's office, where the defendant told Mrs. Dietrich about alleged noises in a vacant room next to the Fosters' room.

Mrs. Dietrich went into the vacant room to investigate. As she came back towards the middle of the room, the defendant grabbed her and threw her onto the floor. From her position at the door, Liz saw the defendant's hand moving up and down rapidly. At first Liz heard Mrs. Dietrich yelling; then she heard nothing. Liz asked the defendant to stop, but she did not. Liz ran out the door, telling the defendant that "the cops were coming," although they were not. This brought the defendant out of the vacant room. She and Liz went to the back of the motel where the defendant threw the screwdriver into the woods. Because the defendant was crying, Liz tried to hold her to calm her down. According to Liz,

"And, that's when she stuck. I felt something. I don't know. I guess it was that. I felt something and I asked her what she was gonna do, if she was gonna kill me. And she, I just pulled away from her."

When the pair went back to the Fosters' room, the defendant washed some blood out of either a pair of pants or a shirt. As the women drank some more beer, Mrs. Foster obtained another screwdriver and said that "she had to kill Mrs. Dietrich because she knew who she was." Mrs. Foster went into the next room and, upon her return, said that she had killed the victim by stabbing her in the heart.

Later, after Liz, the defendant and Tommy Foster had disposed of Mrs. Dietrich's body in the Canal, they returned to the motel and looted Mrs. Dietrich's living quarters. Liz described their activities as follows:

"Well, she [the defendant] was going through pocketbooks and she threw me some, told me to go through them and look for money. And Tommy went upstairs and then he came back down, and then we were just going through everything. And then we told her that we wanted to leave, but she didn't want to leave. So, we told her finally, we just said, 'we are gonna leave.'

Q: Who said that?

A: Me and Tommy.

Q: She say anything?

A: She just started coming with us, but before she left, she said she wanted to sit down and have something to eat."

The three then went back to the Fosters' motel room where the defendant produced the money, and Tommy counted it on a calculator. Liz received a television set and $65.00. After the money had been counted, Liz told the couple that she wanted to go home. As they were driving along the road, they threw the screwdriver out of the window. The defendant took the pocketbooks and other things which she had gotten from Mrs. Dietrich and threw them in the trash at the Kimberton Apartment where Liz was living.

Liz was sixteen years old in January of 1981. Since age three she had lived with her grandmother and had infrequent contact with the defendant. Prosecutorial authorities had promised her immunity in exchange for her testimony.

Tammy Rissler's testimony at the defendant's first trial was read to the jury because the State had been unable to locate her prior to the retrial. That testimony confirmed the beer drinking by the three women on January 29, 1981. Ms. Rissler recalled the conversation as they drove along Route 40:

"[Defendant] asked me if I wanted to make some money. And I asked her how and she said that she knew a lady that she could rob."

Ms. Rissler then got out of the defendant's car.

As Tommy Foster had given conflicting statements, some of which were admissions of responsibility for Mrs. Dietrich's murder, the trial court granted the State's request to have him called as a court witness. He testified that on January 29, 1981, he worked the 2:30 to 11:00 p.m. shift at RMR Corporation. At 11:00 p.m. he was picked up by the defendant and Liz, both of whom had been drinking quite a bit and seemed upset. On the ride to the motel the defendant said that Mrs. Dietrich was dead. After arriving there, Tommy saw the body in the vacant room next to the Fosters' room. They decided to clean up the room, dispose of the body, and remove all evidence that they had resided there. After trying to wipe up the blood, Tommy placed the body in the car. The three drove to a drainage ditch. After tying the body to a cinder block with rope, Tommy carried it into the water and released it. They returned to the motel, went into Mrs. Dietrich's apartment, and took money, a TV, and papers bearing their names.

A letter dated January 30, 1981, and written to "Princess," was introduced into evidence. It contained an admission by Tommy that he had killed Mrs. Dietrich. Tommy denied writing the letter. A second letter, mailed to "The Attorney General" in June 1981, contained a confession, a description of the murder, and a statement that the defendant had slept through the killing. Tommy admitted authorship of this letter but explained that it was intended to protect his wife. A third letter, mailed to the defendant in June 1981, also incriminated Tommy and exonerated the defendant. Tommy could not confirm that he had written it. A defense handwriting expert, Irby Todd, testified that the author of the second letter had probably written the first letter and had even more probably written the third letter. Tommy also admitted that he was testifying pursuant to a plea agreement, which involved a State promise to

accept guilty pleas to theft and obstruction of justice and to recommend a twelve-year sentence.

The State also presented circumstantial evidence of the defendant Foster's connection with the robbery and homicide. Witnesses testified that on January 29, 1981, she was in need of money to buy drugs and pawned her wedding ring. The following day she bought a used car and paid $650 in cash. The money was folded lengthwise, as were other bills in her possession. Mrs. Dietrich's daughter testified that Mrs. Dietrich had a lifelong habit of folding her money in this manner.

The defendant did not testify at the trial. The jury, however, learned of her conflicting accounts of the events of January 29, 1981. Some were given to investigating police officers; others were part of her testimony at her first trial, which the State read to the jury. The defendant had initially told the first jury that from January 29 to 31 she was in Pennsylvania with Robert Shade. When confronted with evidence of Shade's incarceration in Delaware during that period, the defendant stated that her alibi was a lie designed to protect Liz. She then testified that, to the best of her knowledge, Mrs. Dietrich was alive when she and Liz picked Tommy up at work on the night of January 29. After returning to the motel, she drank some beer and went to sleep. She next recalled Liz running about. The defendant stepped outside and saw Mrs. Dietrich lying dead in in the grass. She did not go to the Canal to dispose of the body, but she admitted taking Mrs. Dietrich's money after Tommy returned. At one point in her testimony she stated that, "I'm a thief, but I'm not a murderer."

The defense sought to bolster its theory that Tommy was the murderer with the testimony of Mrs. Dietrich's friend, Helen Douglass. According to Mrs. Douglass, the victim had told her that, "Every time I ask him [Tommy] for the rent, he threatens to kill me." Mrs. Dietrich was "terrified" of Tommy and considered him to be "a terrible man."

As previously mentioned, the jury found the defendant Doris Foster guilty of felony murder. Thereafter, at the sentencing hearing before the same jury, a redacted and updated version of the Pre-Sentence Investigation Report concerning the defendant, prepared by a probation agent, was introduced. In addition, the probation agent testified; the defendant made a statement to the jury, and it was stipulated that the defendant's criminal record included a 1973 North Carolina conviction for attempted armed robbery. Following the court's instructions and arguments by counsel, the sentencing question was submitted to the jury, and, as noted earlier, the jury decided that the appropriate sentence was death.

On appeal the defendant raises seven issues, three relating to the guilt or innocence phase of the proceedings and four relating only to the sentence. We shall proceed to deal with each one of these questions, although not in the same order set forth in the defendant's brief.

## I.

The defendant argues that the denial of her pretrial motion for two separate juries, and the striking for cause of a prospective juror who was so opposed to capital punishment that his impartiality would be affected, unconstitutionally deprived her of an impartial and a representative jury at the guilt or innocence phase of the trial.[1]

---

1. The constitutional provisions relied on by the defendant in this Court are the Jury Trial Clause of the Sixth Amendment, applicable to state proceedings by virtue of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the equal protection principle embodied in Article 24 of the Maryland Declaration of Rights. In the trial court, the defendant also invoked the due process clauses of the federal and state constitutions and Article 5 of the Maryland Declaration of Rights. The defendant's contentions under all of the cited constitutional provisions are based on the same premise, namely that the exclusion of jurors so opposed to capital punishment that their impartiality might be affected allegedly deprived the defendant of an impartial and a representative jury on the question of guilt or innocence.

The facts underlying this contention are as follows. Prior to trial, the defendant filed a written "Motion to Allow Defendant Two Separate Juries For The Trial And Sentencing Stages." In a memorandum accompanying the motion, the defendant maintained that a "jury that is 'death qualified' under *Witherspoon v. Illinois*, 391 U.S. 510 [, 88 S.Ct. 1770, 20 L.Ed.2d 776] (1968)," *i.e.*, a jury from which have been excluded those persons so opposed to capital punishment that they would not be impartial, "is more prone to convict ... [and] is neither 'impartial' nor 'indifferent.'" The defendant asserted that "[c]ompelling the defendant to have the guilt/innocence phase of her trial determined by a jury which has been statistically proven to be conviction oriented and neither 'impartial' nor 'indifferent' violates her right to a fair trial, due process, and an impartial jury as guaranteed by the Federal and State Constitutions." The defendant asked the court to provide her "with two separate and distinct juries," described as follows:

"The first would, like all other juries, only decide the Defendant's guilt *vel non*. As such, it would not have to be 'death-qualified' under *Witherspoon*. If a conviction of first degree murder were returned by the first jury, a second jury would be 'death-qualified' to decide punishment. With guilt having already been established by the first jury, there would be no prejudice in the second, sentencing jury, being 'death-qualified'. Such a procedure is the only possible procedure whereby Article 27, § 412–414 can be applied in a constitutional manner."

At the hearing on the defendant's pre-trial motion, defense counsel relied on the recent United States District Court opinion in *Grigsby v. Mabry*, 569 F.Supp. 1273 (E.D. Ark.1983). Counsel submitted that studies subsequent to the Supreme Court's opinion in *Witherspoon v. Illinois*, *supra*, demonstrated that "the *Witherspoon* process denied [a] defendant a representative jury, that it excludes a whole segment of the population that should not be excluded at the guilt/innocence phase ... [,that] it also results in the type of juror remaining who is statistically more likely to

vote for guilt...." Defense counsel indicated that "social science data" would be offered for the court's review, but the trial judge (Cole, J.) replied that he would rule on the issue, as a matter of law, without reviewing the material. The court thereupon denied the motion, citing the *Witherspoon* case and pointing out that the statute (Art. 27, § 413(b)) provided that the sentencing proceeding should be conducted before the same jury that determined the defendant's guilt. Judge Cole said that he rejected the defendant's argument as a matter of law, indicating that the procedure sanctioned in *Witherspoon* resulted in an impartial and a representative jury.

Thereafter, during the jury selection, the trial judge informed the prospective jurors that "a person may not be disqualified or excused or excluded from service from a particular case as a juror ... by reason of his belief against capital punishment ... unless such belief would prevent him or her from rendering [an] impartial verdict, according to the law." The trial judge went on to explain that the foregoing instruction

"means simply this: You may have, you may be opposed to capital punishment. However, that opposition has to be so great that you couldn't, that you couldn't lay this opposition or opinion aside and decide the first trial on it fairly and impartially, based solely on the evidence; that is, whether she is guilty or not guilty of the offense.

"You understand what I'm saying?

"So, the first question I want to ask you: Are any of you opposed to the capital punishment? If so, raise your hand."

Several prospective jurors raised their hands and indicated that they were opposed to capital punishment. Upon further questioning only one, Clarence Kennedy, indicated that his opposition to the death penalty was so strong that it affected his impartiality. Upon extensive questioning by the prosecutor and the defense attorney, Mr. Kennedy repeatedly indicated that he could not vote to sentence the defendant to death. Furthermore, Mr. Kennedy stated that

because he would be sitting on the jury during the sentencing hearing if the defendant were found guilty, and as he would not want to face that prospect, his impartiality at the guilt or innocence phase of the proceedings would be affected. The trial judge, over the defendant's objection, excused Mr. Kennedy for cause.

At the conclusion of the jury selection process, after the voir dire and the exercise of peremptory challenges, the following occurred:

"THE COURT: Is the jury as now constituted acceptable to the Defense?

"DEFENSE ATTORNEY: If I may have one moment, Your Honor.

"THE COURT: Go ahead. Take it. Go ahead.

"DEFENSE ATTORNEY: Acceptable to Defense.

"THE COURT: To the State?

"PROSECUTING ATTORNEY: Acceptable, Your Honor.

"THE COURT: Swear the jury.

"THE CLERK: May I have the jurors stand and may I have the Defendant stand and face the jury?

"Ladies and gentlemen of the jury, raise your right hands.

"(The Clerk is swearing the jury at this time.)

"THE COURT: Madam Forelady, ladies and gentlemen of the jury, you're sworn...."

The defendant's argument, that her conviction should be reversed because of the denial of the motion for a bifurcated jury and the exclusion from the jury of Mr. Kennedy, must be rejected on two separate grounds.

### A.

■ As pointed out above, at the conclusion of the jury selection process defense counsel expressly stated, without any reservations or limitations, that the jury was acceptable to the defense. This Court has repeatedly taken the position that where a party has previously made an objection

with regard to a prospective juror or prospective jurors, and thereafter, at the conclusion of the jury selection process, unequivocally states that the jury as selected is acceptable, such party has withdrawn or abandoned his prior objection. *Thomas v. State,* 301 Md. 294, 310, 483 A.2d 6 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *White v. State,* 300 Md. 719, 729, 481 A.2d 201 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985); *Calhoun v. State,* 297 Md. 563, 579–580, 468 A.2d 45 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Glover, Robinson & Gilmore v. State,* 273 Md. 448, 452–453, 330 A.2d 201 (1975); *Neusbaum v. State,* 156 Md. 149, 143 A. 872 (1928).[2]

There are, however, two differences between the above-cited cases and the case at bar. First, in all of the cited cases the defendant's objection was to the *inclusion* of a prospective juror or a number of prospective jurors. In the instant case, on the other hand, the defendant's objection was to the *exclusion* of an alleged class of prospective jurors, of which Mr. Kennedy apparently turned out to be the only member. Second, in this case the issue had been raised in a pre-trial motion as well as by objection during voir dire, whereas in the above-cited cases no similar pre-trial motions had been filed. Nevertheless, under the circumstances, neither of these factual differences justify a different result.

---

**2.** These cases should be distinguished from the situation where the party's objection is not directly aimed at a prospective juror or prospective jurors. For example, in *Couser v. State,* 282 Md. 125, 383 A.2d 389, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978), during the voir dire the trial judge denied the defendant's request to have a copy of or inspect the prosecution's dossier on the prospective jurors, and we held that the defendant's objection to the denial of this request was not abandoned when, at the conclusion of the jury selection process, defense counsel stated that the jury was acceptable to the defense. We pointed out that the defendant's "objection was only indirectly aimed at the composition of the jury ultimately selected." 282 Md. at 130, 383 A.2d 389.

Generally, when one states without qualification that a jury is acceptable to him, such statement is inconsistent with a previous objection to the composition of the jury regardless of whether that objection was to the seating of prospective jurors or to the exclusion of prospective jurors. Furthermore, while our prior cases may have in fact involved objections to the inclusion of prospective jurors, the principle set forth in the opinions covered both situations. *See, e.g., Thomas v. State, supra,* 301 Md. at 310, 483 A.2d 6 ("any objection to the composition of the jury or the panel of talesmen was waived when he unequivocally indicated that the jury was acceptable to him"). Finally, cases in other jurisdictions recognizing this principle have equally applied it where the objection was to the exclusion of prospective jurors. *See, e.g., State v. Arnett,* 119 Ariz. 38, 50, 579 P.2d 542, 554 (1978) (citing this Court's *Glover* opinion, 273 Md. 448, 330 A.2d 201); *State v. Marchese,* 14 N.J. 16, 101 A.2d 13, 15–16 (1953). *See also Com. v. Szuchon,* 506 Pa. 228, 484 A.2d 1365, 1379 (1984) (pointing out that "[d]efense counsel was obviously satisfied that the veniremen whose exclusions are now challenged were properly excluded under *Witherspoon*," and holding "that a *Witherspoon* issue [can] be waived.") *Cf., Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 856 n. 11, 83 L.Ed.2d 841 (1985); *Clark v. State,* 264 Ark. 630, 573 S.W.2d 622, 625–626 (1978).

The fact that, in the present case, the matter was raised by a pre-trial motion, in addition to the later objection during voir dire, is also irrelevant under the circumstances here. The issue was the same, even though raised at two different times. If the prospective juror Kennedy had not been excluded for cause, there would have been no prospective jurors excluded because of the effect of their beliefs concerning capital punishment. If Mr. Kennedy had been seated, the defendant would have received precisely the type of jury, for the guilt or innocence phase, which she had sought in her pre-trial motion. When defense counsel expressly stated, without qualification, that the jury was

acceptable, he was taking a position directly at odds with the position taken in the pre-trial motion.

Under the facts of this case, therefore, the defendant Foster abandoned the objection to the composition of the jury which she had previously made in the pre-trial motion and during voir dire.[3]

## B.

As an alternate ground for our decision, we reject on the merits the argument that, in a capital murder prosecution, the exclusion of prospective jurors so opposed to capital punishment that their impartiality would be affected, deprives a defendant of his or her constitutional right to an impartial jury at the guilt or innocence phase of the trial.

Preliminarily, there is no doubt that under Maryland statutory and common law, the denial of the defendant's pre-trial motion for a bifurcated jury and the exclusion of Mr. Kennedy were fully warranted. This State's capital punishment statute, with specified exceptions not here applicable, provides that the sentencing "proceeding shall be conducted ... [b]efore the jury that determined the defendant's guilt...." Code (1957, 1982 Repl.Vol.), Art. 27, § 413(b)(1).[4] In addition, this Court has consistently held

---

**3.** There may be situations, involving different circumstances from those here, where counsel's statement that the jury is acceptable would not be deemed an abandonment of a prior objection to the alleged exclusion of a particular class of persons as jurors. We need not in this opinion, however, speculate about situations which may differ from that presented in the instant case.

**4.** Art. 27, §§ 413(a) and (b) are as follows:

"(a) *Separate sentencing proceeding required.*—If a person is found guilty of murder in the first degree, and if the State had given the notice required under § 412(b), a separate sentencing proceeding shall be conducted as soon as practicable after the trial has been completed to determine whether he shall be sentenced to death or imprisonment for life.

(b) *Before whom proceeding conducted.*—This proceeding shall be conducted:

(1) Before the jury that determined the defendant's guilt; or

(2) Before a jury impaneled for the purpose of the proceeding if:

that if a prospective juror is "unable to apply the law" or "holds a particular belief . . . that would affect his ability or disposition to consider the evidence fairly and impartially," he "should be excused for cause." *King v. State*, 287 Md. 530, 535, 414 A.2d 909 (1980). *See Grossfeld v. Braverman*, 203 Md. 498, 501, 101 A.2d 824 (1954); *Adams, Nelson, and Timanus v. State*, 200 Md. 133, 140–141, 88 A.2d 556 (1952); *Lockhart v. State*, 145 Md. 602, 615–617, 125 A. 829 (1924).

Judge Cole correctly disqualified Mr. Kennedy under the standard set forth in the above-cited cases. During the voir dire examination of Mr. Kennedy, the prospective juror stated several times that he would not want to vote to impose the death penalty. He also stated that he could not think of any case "where a death penalty would be . . . appropriate," that he would not "be persuaded at some point, in some certain case, that the death penalty was appropriate," and that his opposition to the death penalty would "influence [his] decision making process." The trial judge then began to question Mr. Kennedy concerning the guilt or innocence phase of the trial. The colloquy was as follows:

"THE COURT: Mr. Kennedy, there's two phases to this: Number one is the trial on the merits. Are you with me so far?

"MR. KENNEDY: Yeah.

"THE COURT: The first trial you determine, basically, is she or is she not guilty of felony murder. And if you find her guilty of felony murder, then you come back in a

---

(i) The defendant was convicted upon a plea of guilty;

(ii) The defendant was convicted after a trial before the court sitting without a jury;

(iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or

(iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or

(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant."

day or two or week or two or depending on whenever the next case is set up to determine whether or not she should live or die. You understand that?

"MR. KENNEDY: (Nods in assent.)

"THE COURT: They are two separate phases. All right. Now, we are talking about phase one. You are determining, at this point in your own mind, is she guilty or not guilty of felony murder; that is killing somebody during a robbery. Would the fact that, would the fact that you have to come back next week or so, to determine whether she live or die, affect you in the first case? Would you be able to be fair in the first case, to the State and to her, knowing that you'll come back in a week or two? Can you set aside that thinking that you're coming back and decide it strictly on the evidence in the first case, whether she's guilty or not?

"MR. KENNEDY: Probably not 'cause I'm gonna be thinking about it, knowing that.

\*      \*      \*      \*      \*      \*

"THE COURT: Remember there's two trials.

"MR. KENNEDY: Yeah.

"THE COURT: You're supposed to not even think about the second trial.

"MR. KENNEDY: Right, but I'm gonna be on both juries, right?

"THE COURT: Well, there's a chance you'll be on both juries. But the point is, in the first trial you're not even supposed to think about the death penalty. Could you put that out of your mind and decide the first trial, based solely on the evidence, whether she's guilty or not, and not even consider the fact there will be a second trial. And that at the second trial you'll have the life or death choice. You are only disqualified from serving if you're so opposed to capital punishment that you can't find her, say, guilty in the first trial, assuming that the State proved their case beyond a reasonable doubt, which is the

test, could find her guilty in the first trial, even though you knew there would be a second trial?

"MR. KENNEDY: Probably not 'cause, like I say, I'm gonna, if I find her guilty, I'm gonna have to go with the next one. I wouldn't want to sit on that.

"THE COURT: I'm asking you point blank. I don't want probably.

"MR. KENNEDY: No.

"THE COURT: Could you or couldn't you?

"MR. KENNEDY: No.

*     *     *     *     *     *

"THE COURT: ... Mr. Kennedy. As I understand it—let's recap here. You would say that if the State proved beyond a reasonable doubt she was guilty of felony murder, that is, killing during robbery, that you would not vote for guilt because of the second trial, where you'd have to perhaps sentence her to the death penalty. Is that correct?

"MR. KENNEDY: Yes.

"THE COURT: All right. He's disqualified."

In light of his answers, the exclusion of Mr. Kennedy from the jury was obviously justified under Maryland law.

The defendant Foster argues, however, that "Mr. Kennedy gave no response throughout the entire *voir dire* process which called into question his qualification to serve as an impartial juror on the question of guilt or innocence, apart from the matter of the death penalty." (Brief, p. 53). The defendant suggests that if separate juries had been impaneled, there is nothing to indicate that Mr. Kennedy's impartiality concerning guilt or innocence would have been affected.[5] The thrust of the defendant's argument is that juries, from which persons like Mr. Kennedy have been excluded, are more prosecution prone and, therefore, are

---

**5.** In light of Mr. Kennedy's statements quoted above, and his knowledge that a guilty verdict would lead to a capital sentencing proceeding, the validity of this suggestion is at least debatable. Nevertheless, for purposes of argument, we shall accept it.

not impartial or representative as to the question of guilt or innocence.

This argument was made but not accepted by the Supreme Court in *Witherspoon v. Illinois, supra. Witherspoon* held that in a murder trial involving the possible imposition of the death sentence, the exclusion of "veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction," was a denial of the defendant's Sixth Amendment right to an impartial jury. 391 U.S. at 522, 88 S.Ct. at 1777. At the same time, *Witherspoon* stated that its holding did not prevent a state from excluding prospective jurors if their opposition to capital punishment would prevent them from voting to impose the death penalty or prevent them from making an impartial decision as to the defendant's guilt. *Ibid.* n. 21. With regard to an argument similar to that made by the defendant Foster, the Supreme Court stated in *Witherspoon* (*id.* at 516–518, 88 S.Ct. at 1774–1775):

"The petitioner contends that a State cannot confer upon a jury selected in this manner the power to determine guilt. He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he describes as 'competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence.'

"The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us

or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."

The defendant replies that, since the *Witherspoon* case was decided, more than two dozen studies have been made by various scholars and organizations, and that these studies have all "concluded that death-qualified juries are more favorable to the prosecution than juries selected in the ordinary manner." (Brief, pp. 54–55).[6] While the Supreme Court has not specifically addressed this contention in a regular case after *Witherspoon*,[7] the Court has nevertheless continued to hold that the constitutional principles set forth in its jury selection cases allow the exclusion in capital mur-

---

6.  These studies have been described and discussed in a great deal of legal literature. *See, e.g., Grigsby v. Mabry,* 758 F.2d 226 (8th Cir. 1985), *affirming Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983), *petition for a writ of certiorari granted,* —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985); *Keeten v. Garrison,* 742 F.2d 129 (4th Cir.1984); *Smith v. Balkcom,* 660 F.2d 573 (5th Cir.1981), *modified* 671 F.2d 858 (5th Cir.1982); *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978); *People v. Fields,* 35 Cal.3d 329, 197 Cal.Rptr. 803, 673 P.2d 680 (1983), —— U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 204 (1984); *Hovey v. Superior Court of Alameda Cty.,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980); Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 U.Colo.L.Rev. 1 (1970); Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, And Use of Psychological Data To Raise Presumptions In The Law,* 5 Harvard Civil Rights—Civil Liberties L.Rev. 53 (1970); Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971); White, *Death-Qualified Juries: The "Prosecution Proneness" Argument Reexamined,* 41 U.Pitt.L.Rev. 353 (1980); White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries,* 58 Cornell L.Rev. 1176 (1973). *See also* the various articles in 8 Law and Human Behavior 1–195 (1984).

7.  *See,* however, *Maggio v. Williams,* 464 U.S. 46, 104 S.Ct. 311, 314, 78 L.Ed.2d 43 (1983); *Sullivan v. Wainwright,* 464 U.S. 109, 104 S.Ct. 450, 451, 78 L.Ed.2d 210 (1983); and *Woodard v. Hutchins,* 464 U.S. 377, 104 S.Ct. 752, 754–755, 78 L.Ed.2d 541 (1984), all involving applications for a stay or to vacate a stay.

der cases of prospective jurors who cannot be impartial or cannot follow the law as instructed by the trial judge.

Thus, in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court upheld the exclusion of certain jurors opposed to the death penalty, saying that nothing in its prior cases "suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge." 438 U.S. at 596–597, 98 S.Ct. at 2960. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), dealt with jury selection under the two-phase procedure of the Texas capital punishment statute. After discussing *Witherspoon, Lockett,* and other cases, the Court stated in *Adams* (448 U.S. at 45, 100 S.Ct. at 2526):

> "This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court."

Just this year, in *Wainwright v. Witt,* —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a murder prosecution under the Florida capital punishment law, the Supreme Court upheld the trial judge's exclusion of a juror who stated that she was "afraid" that her opposition to the death penalty would interfere with her sitting as a juror in the case and that she thought that her beliefs would interfere with judging the defendant's guilt or innocence. 105 S.Ct. at 848. The Court in *Witt,* if anything, broadened " 'the limitation upon the state's power to exclude' " [8] be-

---

**8.** 105 S.Ct. at 851, quoting from *Adams v. Texas, supra,* 448 U.S. at 48, 100 S.Ct. at 2528.

yond that set forth in the *Witherspoon* opinion.[9] Moreover, the *Witt* opinion made it clear that a criminal defendant, whether charged with capital murder or another crime, is not constitutionally entitled to a jury selection standard that will likely result in the seating of jurors biased in the defendant's favor, saying (*id.* at 852):

"[T]here is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Witherspoon* is not grounded in the Eighth

---

**9.** The Court in *Witt,* after discussing the language from *Witherspoon* and then the language from *Adams,* thus stated (105 S.Ct. at 851):

"[T]he standard applied in *Adams* differs markedly from the language of footnote 21 [in *Witherspoon*]. The tests with respect to sentencing and guilt, originally in two prongs, have been merged; the requirement that a juror may be excluded only if he would never vote for the death penalty is now missing; gone too is the extremely high burden of proof. In general, the standard has been simplified.

"There is good reason why the *Adams* test is preferable for determining juror exclusion. First, although given *Witherspoon's* facts a court applying the general principles of *Adams* could have arrived at the 'automatically' language of *Witherspoon's* footnote 21, we do not believe that language can be squared with the duties of present-day capital sentencing juries. In *Witherspoon* the jury was vested with unlimited discretion in choice of sentence. Given this discretion a juror willing to *consider* the death penalty arguably was able to 'follow the law and abide by his oath' in choosing the 'proper' sentence. Nothing more was required. Under this understanding the only veniremembers who could be deemed excludable were those who would never vote for the death sentence or who could not impartially judge guilt.

"After our decisions in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), however, sentencing juries could no longer be invested with such discretion. As in the State of Texas, many capital sentencing juries are now asked specific questions, often factual, the answers to which will determine whether death is the appropriate penalty. In such circumstances it does not make sense to require simply that a juror not 'automatically' vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a

Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consist of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor."

Although the Supreme Court may not have directly addressed the precise issue raised by the defendant Foster in the case at bar, nevertheless it is difficult to reconcile the defendant's position with the standards for permissible exclusion of prospective jurors set forth in the *Lockett, Adams* and *Witt* opinions. Moreover, several federal courts of appeal and state supreme courts have addressed the argument made by the defendant here, and all except one have rejected it.

The United States Court of Appeals for the Fifth Circuit, in *Spinkellink v. Wainwright,* 578 F.2d 582, 593–596 (5th Cir.1978), citing some of the same studies relied on by the defendant Foster, assumed for purposes of argument that "a death-qualified jury is prosecution prone," meaning "that a death qualified jury is more likely to convict than a nondeath-qualified jury." 578 F.2d at 593. The court then stated (*id.* at 594):

"Even if it is true, the petitioner's contention still must fail. That a death-qualified jury is more likely to convict than a nondeath-qualified jury does not demonstrate which jury is impartial. It indicates only that a death-qualified jury might favor the prosecution and that a nondeath-qualified jury might favor the defendant."

The court also pointed out that if separate juries were selected for purposes of Florida's bifurcated trial procedure

State must allow a venireman to sit despite the fact that he will be unable to view the case impartially."

in capital cases, and if *Witherspoon*-excludable persons were seated for only the guilt-innocence phase, such jurors might still have a problem with regard to impartiality (*id.* at 595–596):

> "Even under Florida's bifurcated trial procedure in these cases, the situation would be no less problematic. Although the juror could be excused from the jury during the sentencing phase of the trial, during the guilt-determination phase he still would know that a vote to convict could eventually mean the death penalty, a result to which he would have contributed, if only indirectly. His choices as to how to vote on the defendant's guilt or innocence would remain equally troublesome.
>
> . "The right under the Sixth and Fourteenth Amendments to trial by a jury guarantees to the criminally accused 'a fair trial by a panel of impartial, "indifferent" jurors.' ... But the state also enjoys the right to an impartial jury, *Williams v. Wainwright, supra,* 427 F.2d [921] at 923 [ (5th Cir.1970) ], and impartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution."

In *Smith v. Balkcom,* 660 F.2d 573 (5th Cir.1981), *modified,* 671 F.2d 858 (5th Cir.) *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), a case involving the bifurcated trial procedure under the Georgia capital punishment statute, the United States Court of Appeals for the Fifth Circuit reaffirmed its holding in *Spinkellink*. Again assuming without deciding that the studies relied upon established that juries not containing those persons excludable under *Witherspoon* are more prosecution prone, the Fifth Circuit said (660 F.2d at 578–579):

> "The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side of the case. Clearly, the extremes must be eliminated—i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.

The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury *least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment. Yet Smith here urges that he has a constitutional right to a jury *more* likely than a death-qualified jury to find him innocent.

"In essence, Smith urges us to define 'impartial' as a middle ground that involves a jury with persons who are in effect defendant prone."

The United States Court of Appeals for the Fourth Circuit dealt with the issue in *Keeten v. Garrison*, 742 F.2d 129 (4th Cir.1984), involving jury selection under the North Carolina capital punishment law. That law, like Georgia's and Maryland's, provides for a bifurcated trial procedure; if the jury finds the defendant guilty at the first stage, a capital sentencing proceeding is later conducted before the same jury. The Fourth Circuit in *Keeten* also assumed that the studies and evidence presented to the district court established that the exclusion of prospective jurors under the standards of *Witherspoon* created a more conviction prone jury. 742 F.2d at 133. Nevertheless the court, agreeing with the reasoning of the Fifth Circuit in *Spinkellink* and *Smith*, held that there was no denial of constitutional rights. Other cases have also rejected arguments like those of the defendant Foster and have concluded (although the reasoning and analysis has not always been the same) that the exclusion from juries in capital cases of *Witherspoon*-excludables does not abridge constitutional rights. *See, e.g., People v. Fields*, 35 Cal.3d 329, 197 Cal.Rptr. 803, 673 P.2d 680, 687–695 (1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 204 (1984); *State v.*

*Oritz,* 88 N.M. 370, 540 P.2d 850, 852–854 (1975); *Com. v. Szuchon, supra,* 484 A.2d at 1381.

We are aware of only one appellate decision to the contrary, *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir.1985).[10] The district court in that case, after a previous remand, held that in a capital murder prosecution the exclusion during voir dire of *Witherspoon*-excludables violated the defendant's right to have a jury selected from a representative cross section of the community and violated his right to an impartial jury. The trial court held that in capital cases Arkansas must empanel separate juries, one for the guilt or innocence phase and one for the sentencing phase. The Eighth Circuit affirmed on the ground

> "that substantial evidence supports the court's finding that a capital jury, with WEs [*Witherspoon*-excludables] stricken for cause, is in fact conviction prone and, therefore, does not constitute a cross-sectional representation in a given community." 758 F.2d at 229.[11]

The United States Court of Appeals relied on *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), which dealt with unrepresentative juries due to the exclusion of a "distinctive" class or group in the community. The Eighth Circuit held that *Witherspoon*-excludables constituted a "distinct" class in the community. The court rejected the reasoning of the Fourth and Fifth Circuits, stating that the "analysis [in *Spinkellink*] misses the point" and that the

> "issue is not whether a jury would be biased one way or the other, but whether an impartial jury can exist when a

---

**10.** The United States Supreme Court has granted a petition for a writ of certiorari in this case, —— U.S. ——, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985).

**11.** The court did modify the remedy ordered, holding that it should be left to the discretion of the state, and suggesting, *inter alia,* that the state may prefer to select enough alternate jurors initially to replace the *Witherspoon*-excludables during the sentencing phase. 758 F.2d at 243.

distinct group in the community is excluded by systematically challenging them for cause." *Id.* at 241–242. The court took the position that

"The systematic exclusion of any distinct qualified group from jury service violates the cross-sectional requirement of the sixth amendment whatever the bias of that group." *Id.* at 236.

We flatly disagree with the Eighth Circuit's holding in the *Grigsby* case. Preliminarily, we question whether so-called *Witherspoon*-excludables constitute a "distinct" group or class in the community within the meaning of the *Duren* and *Taylor* opinions. *See, Grigsby v. Mabry, supra,* 758 F.2d at 244–247 (Gibson, J., dissenting); *People v. Fields, supra,* 197 Cal.3d at 815, 673 P.2d at 692. More basically, however, we do not believe that the Eighth Circuit's reasoning can be squared with the opinions of the Supreme Court. The view that the right to a representative jury, under the principles enunciated in *Duren* and *Taylor,* includes the right to have biased jurors, is inconsistent with *Lockett v. Ohio, supra,* 438 U.S. at 596–597, 98 S.Ct. at 2960, where the Court stated:

"Nor was there any violation of the principles of *Taylor v. Louisiana, supra* [, in excluding four prospective jurors under *Witherspoon*]. In *Taylor,* the Court invalidated a jury selection system that operated to exclude a 'grossly disproportionate,' 419 U.S., at 525, 95 S.Ct., at 695, number of women from jury service thereby depriving the petitioner of a jury chosen from a 'fair cross-section' of the community, *id.,* at 530, 95 S.Ct. at 697. Nothing in *Taylor,* however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge."

Furthermore, the Eighth Circuit's theory, that a jury bias against the prosecution is irrelevant, cannot be reconciled with *Wainwright v. Witt, supra.*

We agree with the conclusion reached in *Spinkellink, Smith, Keeten,* and similar cases. We shall assume that the studies relied on by the defendant Foster are valid, and that a jury in a capital case from which persons have been excluded under the principles of *Witherspoon* is more prosecution prone than a jury containing *Witherspoon*-excludables. Nonetheless, it does not follow that the former jury is less impartial, or less representative than the latter. Finally, in our view it is totally unrealistic to assume that a prospective juror in a capital case, whose opposition to the death penalty would prevent him from voting to impose it or would affect his determination of guilt or innocence in a single trial proceeding or a bifurcated proceeding with the same jury, would likely become unbiased if he knew that a different jury or the same jury with him excluded would determine the sentence.

On alternate grounds, therefore, we do not accept the defendant's argument that the denial of her motion for a bifurcated jury and the exclusion of Mr. Kennedy require the reversal of the conviction.

## II.

The second ground upon which the defendant challenges her conviction also relates to jury selection, although it involves much less substance than the first.

The defendant filed a pre-trial motion to stay the jury selection proceedings, claiming that jury selection practices in the Circuit Court for Cecil County violated Code (1974, 1984 Repl. Vol.), Title 8 of the Courts and Judicial Proceedings Article. The pertinent facts, as taken verbatim from the defendant's brief, p. 4, are as follows:

"The second motion, a Motion to Stay Jury Selection Proceedings, alleged that the process by which Appellant's jury was selected violated Title 8 of the Courts and Judicial Proceedings Article of the Code (1984 Repl. Vol.). Appellant argued, *inter alia,* that the practice whereby jurors rejected at one trial are the first to be called for

service at a subsequent trial constituted a substantial failure to comply with the statutory requirement of a jury that is randomly selected from a fair cross section of the community. (E. 302–04). At a hearing on the motion the Jury Clerk, Wendy Gabbert, testified. She stated that jury selection begins with the mailing out of 700 forms to persons selected at random from the Cecil County voters' list. (E. 309–10). The jury judge, Judge Cole, then determines which of these are disqualified. The remainder are available to serve on a jury for four months. If a given juror is called to court on a given date but does not serve, either because a jury trial did not take place or because he was rejected, he is assigned to the next trial. Appellant's panel, which numbered 78 with 23 on standby, consisted of some jurors that had been rejected from prior trials. (E.310–12). The court found no statutory violation. (E.314–317)."

The gist of the defendant's argument is that "[n]either Title 8 nor the Cecil County Jury Selection Plan authorizes the recycling of jurors by placing those who have been discharged from prior panels directly into Appellant's panel." (Brief, p. 77).

There are two distinct answers to the defendant's argument.

*First,* as previously discussed, at the conclusion of the jury selection process defense counsel stated, without qualification, that the jury was "acceptable to the defense." In *Glover, Robinson & Gilmore v. State, supra,* 273 Md. at 449 n. 1, 452–453, 330 A.2d 201, we specifically held that such unequivocal statement constitutes an abandonment of a prior objection based upon an alleged failure to comply with Title 8 of the Courts and Judicial Proceedings Article.

*Second,* Title 8 of the Courts Article, in § 8–210(e), clearly appears to authorize what happened in this case. That section and § 8–210(f) state:

"(e) *Person excused may be resummoned.*—Any person excused from jury service or from a particular jury

under subsection (a), (b), or (c) of this section is eligible to sit on another jury if the basis for his excuse is not relevant to this ability to serve on the other jury.

"(f) *Disqualification or excuse noted on qualification form.*—When a person is disqualified or excused from jury service, the jury commissioner or clerk shall note the specific reason in the space provided on his juror qualification form or on the juror's card drawn from the qualified jury wheel."

The defendant in her brief does not explain how the record in this case demonstrates a violation of the above-quoted provisions.[12]

### III.

The final issue raised concerning the guilt/innocence phase of the trial is the defendant's contention that the trial judge permitted improper rehabilitation of a state witness.

As previously mentioned, Tammy Rissler's testimony at the defendant's first trial was read to the jury because of the State's inability to locate her prior to the retrial. Thereafter, at the beginning of the defense case, the defendant's attorney indicated that, in order to impeach Tammy Rissler's credibility, he wished to introduce documentary evidence that she had been convicted of harboring a fugitive and of contempt of court. The defendant's attorney, however, requested that a portion of the documentary evidence, showing the disposition or punishment received as a result

---

12. The entire discussion of these provisions in the defendant's brief is as follows (Brief, p. 77):

"Section 8–210(e) does permit the resummoning of jurors in certain circumstances. For example, a person excused because more jurors than necessary were impaneled, the person was believed to be partial or potentially disruptive, or the person was struck peremptorily or for good cause, is eligible to sit on another jury if the basis for his excuse is not relevant to his ability to serve in the subsequent case. Section 8–210(b,e). In order to implement this provision, the Jury Clerk must note the excuse on his juror qualification form or on the juror's card drawn from the qualified jury wheel. Section 8–210(f). The record in this case does not indicate whether such notations were made."

of the convictions, should be deleted. The State objected to the introduction of this evidence on the ground that neither crime was an impeachable offense under *Ricketts v. State*, 291 Md. 701, 436 A.2d 906 (1981). The State argued in the alternative that, if the court were inclined to admit the convictions, the entire certified records including the disposition portions should be admitted. The trial court ruled that it would admit the entire documents. Subsequently the records of convictions, including the dispositions, were offered by defense counsel and admitted into evidence.[13]

The defendant maintains that the trial court erred in "permitting the State to blunt the impeachment effect and rehabilitate Ms. Rissler by showing that she received inconsequential punishment for those convictions." (Brief, p. 82). The defendant relies on cases from other jurisdictions holding that, with regard to impeachment by a prior conviction, testimony concerning the disposition or punishment received is "collateral," or "immaterial" or "irrelevant" to credibility and therefore inadmissible. The defendant points out that the "issue involved here most often arises when a cross-examiner seeks to introduce evidence of the punishment in order to intensify the impeachment impact of a witness' prior conviction," and that cases elsewhere prohibit this because "the logical connection between the extent of punishment and credibility is simply too tenuous." (*Id.* at 85–86).

There is a degree of conflict on this question among the cases throughout the country.[14] Nevertheless, according to McCormick, the "prevailing" view is that the "name of the crime, the time and place of conviction, *and the punish-*

---

**13.** The State in its brief argues that the circumstances surrounding the later offer and admission of the documentary evidence were such that the defendant waived her prior objection. We do not place our decision on this issue.

**14.** Many of the cases, including some of those relied on by the defendant, are collected in Annot., 67 A.L.R.3d 761 (1975), and Annot., 67 A.L.R.3d 775 (1975).

*ment"* are admissible but that "further details such as the name of the victim and the aggravating circumstances may not be inquired into."[15]

While this Court has not dealt with the issue at any length, our cases do indicate that, in connection with the impeachment of a witness's credibility by a prior criminal conviction, it is admissible to bring out the disposition or punishment received. *See, e.g., U. Rwys. & E. Co. of Balt. v. Phillips,* 129 Md. 328, 334, 99 A. 355 (1916) (parole following conviction of larceny); *Mattingly v. Montgomery,* 106 Md. 461, 471, 68 A. 205 (1907) (conviction resulted in a fine); *McLaughlin v. Mencke,* 80 Md. 83, 86–88, 30 A. 603 (1894) (conviction led to confinement in jail). *See also, Dorman v. Koontz,* 164 Md. 535, 538, 165 A. 461 (1933); *Smith v. State,* 64 Md. 25, 20 A. 1026 (1885).[16]

■ We remain of the view that, with regard to impeachment of a witness by a prior judgment of conviction, the sanction imposed is also admissible. It reflects upon the nature of the conviction and, therefore, is relevant to the credibility issue. The appropriate line between admissibility and what should not be allowed was well drawn by the Supreme Court of North Carolina in *State v. Finch,* 293 N.C. 132, 235 S.E.2d 819, 824–825 (1977):

> "Strong policy reasons support the principle that ordinarily one may not go into the details of the crime by which the witness is being impeached. Such details unduly distract the jury from the issues properly before it, harass the witness and inject confusion into the trial of the case. Nevertheless, where a conviction has been established, a limited inquiry into the time and place of conviction *and the punishment imposed* is proper. *See Beaudine v. United States,* 368 F.2d 417 (5th Cir.1966). Such

---

**15.** *McCormick on Evidence* § 43, at 98 (3d ed. 1984), emphasis added.

**16.** The above-cited cases should be distinguished from those which hold that it is not admissible to bring out whether or not the impeaching conviction was upon a guilty plea. *See Turner v. State,* 301 Md. 180, 482 A.2d 869 (1984).

examination, so limited in scope, *permits the jury to more accurately gauge the credibility of the witness* while minimizing the distraction inherent in any collateral inquiry.

"We therefore hold that where, for purposes of impeachment, the witness has admitted a prior conviction, the time and place of the conviction and *the punishment imposed may be inquired into* upon cross-examination. *Accord, Gafford v. State,* 440 P.2d 405 (Alaska 1968), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969), *overruled on other grounds,* 487 P.2d 831 (Alaska 1971); *State v. Washington,* 383 S.W.2d 518 (Mo.1964); *State v. Sinclair,* 57 N.J. 56, 269 A.2d 161 (1970); *State v. Sayward,* 66 Wash.2d 698, 404 P.2d 783 (1965); *See State v. Sheffield,* 251 N.C. 309, 111 S.E.2d 195 (1959); *State v. King,* 224 N.C. 329, 30 S.E.2d 230 (1944); *State v. Holder,* 153 N.C. 606, 69 S.E. 66 (1910). *See generally,* Annot., 67 A.L.R.3d 775 (1975). This is permissible regardless of whether the witness is the accused." (Emphasis added.)

In addition, the defendant Foster cites no case supporting her position that the portion of the certified judgment of conviction, containing the sanction or disposition, should be redacted. Generally, the entire judgment of conviction, including the disposition portion, is held to be admissible for impeachment purposes. *See, e.g., People v. McClellan,* 71 Cal.2d 793, 80 Cal.Rptr. 31, 457 P.2d 871, 882 (1969); *State v. Merra,* 103 N.J.L. 361, 137 A. 575, 577 (1927); *State v. Silver,* 2 N.J.Misc. 479, 127 A. 545, 546 (1925); *State v. Lindsey,* 27 Wash.2d 186, 177 P.2d 387, 389 (1947).

For the above reasons, the trial court did not err in admitting the entire certified record of each conviction.

## IV.

Turning to the contentions relating only to the sentence, the defendant Foster reiterates the arguments, made in virtually all death sentence appeals in this Court, that the

Maryland capital punishment statute is unconstitutional in "two respects—mandatoriness and a defendant's burdens." (Brief, p. 40). With regard to a "defendant's burdens," Mrs. Foster makes two assertions: (1) the statute unconstitutionally places the burden upon the defendant to establish the existence of mitigating circumstances, and if he fails a sentence of death is mandated; (2) the statute unconstitutionally "places the burden on the capital defendant 'to convince [the sentencer] that mitigating circumstances outweigh [  ] the aggravating circumstances'" (*Ibid.*), and it thus "places the ultimate burden of both production and persuasion on the capital defendant, who must be executed if he fails in that regard." (*Id.* at p. 44).

In connection with these particular constitutional arguments, the defendant does not challenge any instruction given by the trial judge, does not complain of any refusal to give a requested instruction, and does not complain of the sentencing form used by the jury. Rather, the defendant has chosen to direct the above-summarized constitutional arguments solely at the statute itself—specifically at some of the language in Art. 27, § 413.[17]

---

**17.** The pertinent language of § 413 is as follows:

"(d) *Consideration of aggravating circumstances.*—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

\*    \*    \*    \*    \*    \*

"(f) *Finding that no aggravating circumstances exist.*—If the court or jury does not find, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall state that conclusion in writing, and the sentence shall be imprisonment for life.

"(g) *Consideration of mitigating circumstances.*—If the court or jury finds, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist:

\*    \*    \*    \*    \*    \*

"(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case.

"(h) *Weighing mitigating and aggravating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circum-

This Court has authoritatively interpreted the language of § 413 and has rejected the identical constitutional challenges which the defendant makes in the case at bar. *See,* in particular, *Tichnell v. State,* 287 Md. 695, 720–737, 415 A.2d 830 (1980) (*Tichnell I*), and *Calhoun v. State,* 297 Md. 563, 635–638, 468 A.2d 45 (1983), *cert. denied,* — U.S. —, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). Nevertheless, because the constitutional issues raised by the Maryland Public Defender's Office representing the defendant in this case, and the same issues raised by that Office in other cases, appear to involve some misunderstanding of the statute as interpreted in *Tichnell I* and *Calhoun,* we have decided to address the issues again and repeat some of the things said in those earlier opinions.

### A.

In arguing that the Maryland statute is unconstitutionally mandatory, the defendant asserts that the statutory language

"requires the sentence of death once the bare existence of a statutory aggravating factor is established if the defendant fails to meet his burden of proof and persuasion. Thus, in this state a sentence of death in circumstances may be mandated where the sentencer is unconvinced that death is the appropriate punishment." (Brief, p. 40).

We need not explore in this case the question of whether a statutory provision, as described by the defendant, would or would not comport with federal constitutional requirements. In our view, the above-quoted description of the Maryland statute is inaccurate.

As pointed out in *Tichnell I,*

---

stances exist, it shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

"(2) If it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

"(3) If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life."

"[s]ection 413 does not explicitly specify which party has the burden of producing evidence and the burden of persuasion. Instead, § 413 speaks in terms of requiring the sentencing authority to make findings that satisfy either the reasonable doubt or the preponderance of evidence standard ...." 287 Md. at 730, 415 A.2d 830. We went on to point out, however, that as § 413(g) "does not require the prosecution to disprove the existence of mitigation," it does place "on the accused the *risk* of nonproduction and nonpersuasion." *Ibid.*, emphasis added. Nevertheless, regardless of what evidence a defendant himself may or may not produce, or regardless of any mitigation argument he may or may not advance, if the jury perceives from the case a fact or circumstance concerning the crime or the defendant, which the jury deems to be mitigating, it may treat it as such. As to mitigation, it is only the *risk* of nonproduction or nonpersuasion which the defendant bears.

Moreover, § 413(g)(8) includes as mitigating circumstances "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." We held in *Tichnell I* that, because of this provision, the Maryland statute "is not a mandatory death penalty statute," and satisfies the standards of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). 287 Md. at 728, 415 A.2d 830. We reiterated this holding in *Calhoun*, pointing out that under the Maryland statute "the sentencing authority may articulate *any factor* it finds in mitigation." 297 Md. at 637, 468 A.2d 45.

■ Therefore, the defendant erroneously argues that "if the defendant fails to meet his burden of proof and persuasion" concerning mitigating circumstances, death "may be mandated where the sentencer is unconvinced that death is the appropriate punishment." (Brief, p. 40). A sentencing authority, unconvinced that death is appropriate, may list as

a mitigating circumstance whatever factor or factors may have led to this conclusion, irrespective of what the defendant produced or argued. If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances. Therefore, as we have repeatedly stated, the Maryland statute is not a mandatory death penalty law.

### B.

Mrs. Foster, in arguing that the Maryland statute is unconstitutional with respect to a "defendant's burdens," also appears to challenge that portion of § 413(g) which provides that if the jury (or court if the defendant so elects) finds beyond a reasonable doubt that one or more of the statutory aggravating circumstances exist, "it shall then consider whether, based upon a preponderance of the evidence, any" mitigating circumstances exist. As pointed out in *Tichnell I* and discussed above, this provision does not expressly put any burden upon the defendant. But, because § 413(g) does not require the State to disprove the existence of mitigating circumstances, it does place the risk of nonproduction and nonpersuasion on the defendant.

The Court in *Tichnell I*, 287 Md. at 730–734, 415 A.2d 830, dealth with this issue in detail, holding that not placing a burden on the prosecution to prove beyond a reasonable doubt the absence of mitigating circumstances was consistent with *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), was in accord with the principles articulated in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), and was supported by cases in other states. In *Tichnell I*, 287 Md. at 732, 415 A.2d 830, we quoted from *Patterson*, 432 U.S. at 209, 97 S.Ct. at 2326, that:

"To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in

which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate."

Generally a defendant in a capital sentencing proceeding will have greater knowledge concerning the presence or absence of mitigating circumstances than the State. Moreover, because of the virtually unlimited scope of what may be deemed by the jury to be a mitigating circumstance under § 413(g)(8), it would be unreasonable to insist that the State establish the absence of such mitigating factors.

We adhere to our prior holdings that § 413(g) comports with constitutional requirements.

### C.

The principal misunderstanding of the Maryland capital punishment statute as interpreted in *Tichnell I*, which is reflected in the defendant's argument of unconstitutionality, is the assertion that § 413 "places the burden on the capital defendant 'to convince [the sentencer] that mitigating circumstances outweigh[ ] the aggravating circumstances,' *Tichnell v. State*, 290 Md. 43, 61, 427 A.2d 991 (1981)" (Brief, p. 40), and that § 413 "places the ultimate burden of both production and persuasion on the capital defendant" (Brief, p. 44).[18] Again we need not decide whether a statute imposing such "burden" on a capital defendant would be constitutional, for the Maryland statute, as interpreted in

---

**18.** The quotation in the defendant's brief from *Tichnell v. State (Tichnell II)*, 290 Md. at 61, 427 A.2d 991, is an illustration of distortion by a partial quotation out of context. The quoted language is taken from the first sentence of a paragraph describing the positions of the parties in the circuit court. The entire first sentence, and the next sentence, are as follows (290 Md. at 61, 427 A.2d 991):

"To persuade the jury to impose a life rather than a death sentence, Tichnell wanted to convince it that the mitigating circumstances outweighed the aggravating circumstances. The heart of Tichnell's case before the sentencing jury was that he shot Deputy Livengood in self-defense at point-blank range as the two men struggled at the open door of Tichnell's car."

Obviously, this Court was not expressing an opinion on the meaning of statutory language; instead, it was describing the trial strategy of defense counsel.

*Tichnell I* and later cases, places no such burden on the defendant.

Subsection (h) of § 413 is concerned with the weighing of mitigating and aggravating circumstances, and it states as follows:

"(h) *Weighing mitigating and aggravating circumstances.*—(1) If the court or jury finds that one or more of these mitigating circumstances exist, it shall determine whether, by a preponderance of the evidence, the mitigating circumstances outweigh the aggravating circumstances.

"(2) If it finds that the mitigating circumstances do not outweigh the aggravating circumstances, the sentence shall be death.

"(3) If it finds that the mitigating circumstances outweigh the aggravating circumstances, the sentence shall be imprisonment for life."

As pointed out previously and in *Tichnell I,* 287 Md. at 730, 415 A.2d 830, this statutory language does not specify which side has the burden of proof or of persuasion. It does specify in paragraph (1) that the applicable standard is "preponderance of the evidence" rather than "beyond a reasonable doubt." The "preponderance of the evidence" test is normal when a court is weighing one set of circumstances against another. Ordinarily in such a balancing process, a court simply determines which side outweighs the other, without being concerned with how much or how clearly one side may outweigh the other. In *Tichnell I,* we did hold that, in this context, the "beyond a reasonable doubt" standard was not required by *In re Winship, supra,* saying that the principles articulated in *Winship* and other cases "do not require the prosecution ... to prove *beyond a reasonable doubt* that the aggravating circumstances outweigh the mitigating circumstances." 287 Md. at 731–732, 415 A.2d 830. We adhere to that view.

With regard to the burden of proof, merely because the General Assembly in § 413(h) referred in paragraph (2) to

whether "mitigating circumstances do not outweigh the aggravating circumstances" and in paragraph (3) to whether "mitigating circumstances outweigh the aggravating circumstances," instead of using the reverse order or some other phraseology, does not reflect a legislative intent to place any burden or risk upon the accused. If the Legislature had added a fourth paragraph to subsection (h), specifying the result if the sentencing authority found that mitigating and aggravating circumstances were in a state of even balance or if the sentencing authority was unable to determine which outweighed the other, there would have been a clear inference regarding the allocation of the burden or risk. But the Legislature added no such fourth paragraph. Instead, the Legislature in § 413(h) merely directed the sentencing authority to engage in a weighing or balancing process, without indicating which side has the burden of proof. The Legislature contemplated in § 413(h) that the sentencing authority would simply evaluate the aggravating circumstances which the prosecution had established beyond a reasonable doubt, and evaluate the mitigating circumstances which it found to exist, and determine which outweighed the other.[19]

Nevertheless, the allocation of the "burden of persuasion" for purposes of § 413(h) would become pertinent in a case where the sentencing authority found the aggravating

---

**19.** In many circumstances when courts or legislative bodies direct a weighing or balancing process, there is no reference to a burden of proof. For example, in § 414(e)(4) of the Maryland capital punishment statute, this Court is directed to weigh the case before us, considering the crime and the defendant, against "similar cases," and make a determination of whether the death sentence in the case before us is "disproportionate" to the penalties imposed in the similar cases. Nothing is said in § 414(e)(4) as to which side has the burden of producing the facts concerning "similar cases" or which side has the burden of persuasion. With regard to the mechanism devised by this Court for the production of facts concerning "similar cases," *see* *Tichnell v. State (Tichnell III),* 297 Md. 432, 464, 466 (majority opinion, 481–483 (concurring opinions), 468 A.2d 1 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), and Maryland Rule 4–343(g).

and mitigating circumstances to be evenly balanced or was unable to determine which outweighed the other. Consequently, because under the statute the State is the moving party, and is seeking to have the death sentence imposed, we interpreted the statute in *Tichnell I* to place the burden of persuasion upon the prosecution with regard to the weighing of aggravating and mitigating circumstances. Chief Judge Murphy unequivocally stated for the Court in that case (287 Md. at 730, 415 A.2d 830):

> "Because the State is attempting to establish that the imposition of the death penalty is an appropriate sentence, the statute places the risk of nonpersuasion on the prosecution with respect to whether the aggravating factors outweigh the mitigating factors."

This holding was reiterated by Judge Cole for the Court in *Trimble v. State*, 300 Md. 387, 415 n. 16, 478 A.2d 1143 (1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1231, 84 L.Ed.2d 368 (1985):

> "In *Tichnell I*, we also construed § 413(h)(2), which provides that the trier of fact shall determine whether 'the mitigating circumstances outweigh the aggravating circumstances,' to place the burden of persuasion on the prosecution."

Again we adhere to our prior holdings that the burden of persuasion for purposes of § 413(h) is upon the prosecution.[20] Therefore we find no merit in the defendant Foster's

---

**20.** Even if we had any doubts about our interpretation of § 413 in *Tichnell I*, and we have no such doubts, it would be inappropriate to change the interpretation at this time. Since *Tichnell I* was decided in 1980, the Legislature has amended § 413 on numerous occasions. *See*, Chs. 8, 296 and 497 of the Acts of 1983; Chs. 255 and 652 of the Acts of 1984. On none of these occasions did the General Assembly, in any respect, modify our interpretation of the statute in *Tichnell I*. Therefore, what the Court said in *Williams v. State*, 292 Md. 201, 210, 438 A.2d 1301 (1981), is fully applicable here. We there stated:

> "The General Assembly is presumed to be aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation. *Harden v. Mass Transit Adm.*, 277 Md. 399, 406, 354 A.2d 817 (1976). This presumption is particularly strong whenever, after statutory

argument that the statute unconstitutionally allocates the burden of proof.

## V.

The defendant makes two arguments concerning what she terms "nonstatutory" mitigating circumstances, *i.e.*, circumstances in addition to the seven mitigating circumstances set forth in § 413(g)(1)–(7), and circumstances which she wished the jury to find as mitigating circumstances under § 413(g)(8).[21] We shall deal with both arguments in this part of the opinion.

---

language has been interpreted by this Court, the Legislature re-enacts the statute without changing in substance the language at issue. *Harbor Island Marina v. Calvert Co.*, 286 Md. 303, 322–323, 407 A.2d 738 (1979); *Director v. Cash*, 269 Md. 331, 345, 305 A.2d 833 (1973) *cert. denied sub nom. Vucci v. Boslow, Institution Director*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974); *Macke Co. v. St. Dep't of Assess. & T.*, 264 Md. 121, 132–133, 285 A.2d 593 (1972); *Stark v. Marney*, 252 Md. 43, 49, 248 A.2d 880 (1969). Under these circumstances, it is particularly inappropriate to depart from the principle of stare decisis and overrule our prior interpretation of the statute. *White v. Prince George's Co.*, 282 Md. 641, 657–658, 387 A.2d 260 (1978). *See also Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972)."

21. The list of mitigating circumstances in § 413(g) is as follows:
    "(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of violence. As used in this paragraph, 'crime of violence' means abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.
    (2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.
    (3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.
    (4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance.

The underlying facts are as follows. At the sentencing hearing the defense asked the jury to find that two of the mitigating circumstances listed in the statute were present, namely that the act of the defendant was not the sole proximate cause of the victim's death (§ 413(g)(6)) and that it was unlikely that the defendant would engage in further criminal activity that would constitute a continuing threat to society (§ 413(g)(7)). In addition, the defense requested that the jury find eleven nonstatutory mitigating circumstances, *e.g.*, that Mrs. Foster had been a model prisoner while confined, that at the time of the offense she was intoxicated by alcohol and drugs, that her mother had left her when she was six years old, that as a child she had been "deprived of proper care, guidance and affection," that her mother had taken her to bars, that the defendant "had a lifelong history of unstable relationships," etc.

In the verdict sheet submitted to the jury, the trial judge listed the seven mitigating circumstances set forth in the statute, listed as numbers eight through eighteen the eleven nonstatutory circumstances argued for by the defense, and listed as number nineteen any other mitigating circumstance which the jury wished to find. In his instructions to the jury, the judge stated that there was a difference between the first seven circumstances and numbers eight through eighteen. With regard to the latter group, the judge indicated that the jury had to find both that the circumstance existed and that it was mitigating, whereas the first seven were deemed to be mitigating by the Legislature. In his jury argument, the prosecuting attorney drew the same distinction.

---

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case."

■ The defendant's first argument is that it was error for the trial judge to instruct the jury, and the State to argue, that the nonstatutory mitigating circumstances had a different legal status than the first seven listed. This argument is totally lacking in merit. The two types of mitigating circumstances obviously are different, as explained by the trial judge. With regard to those factors listed in § 413(g)(1)–(7), the Legislature has, as a matter of law, deemed them to be mitigating. As to them, the only issue to be decided by the jury under subsection (g) is whether one or more of the circumstances existed in the case. Regarding the other group, however, the Legislature has not deemed these factors to be mitigating as a matter of law. With respect to numbers eight through eighteen on the verdict sheet, the jury was required to decide two issues under subsection (g): 1. did the alleged circumstance exist in the case? 2. is it mitigating? This is all that the trial judge and prosecuting attorney were attempting to explain.

■ The second argument made by the defendant is that the evidence concerning some of the asserted nonstatutory mitigating circumstances was uncontradicted, that, therefore, these circumstances existed "as a matter of law," and that it was error for the sentencing authority not to have found the existence of these "mitigating circumstances" on the verdict sheet. This argument again overlooks the valid distinction between the statutory and nonstatutory circumstances. With regard to a nonstatutory circumstance asserted by a defendant, the jury must find both that the circumstance exists and that it is mitigating. While the uncontradicted evidence may demonstrate that a particular factor exists, it is still for the judgment of the sentencing authority to determine whether that factor is mitigating.

We find no error with regard to the consideration of nonstatutory mitigating circumstances by the court or the jury.[22]

## VI.

■■ The Maryland capital punishment statute, in § 414(e), requires that this Court determine the following:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

The defendant makes no argument concerning the first three matters listed above. Nevertheless, we have reviewed the record and conclude that the death sentence was not imposed under the influence of passion, prejudice or an arbitrary factor, that the evidence supports the finding of a statutory aggravating circumstance, and that the evidence supports the jury's determination that the aggravating circumstance outweighed the mitigating circumstances.

The defendant does argue that the sentence of death in this case "is disproportionate to the penalties imposed in similar cases." The defendant identifies the "relevant inventory" of cases as those involving murders committed in

---

**22.** While not stated as a separate issue, the defendant also complains of the prosecuting attorney's characterization, during jury argument, of some of the nonstatutory circumstances as not "legitimate." When read in context, however, all the prosecuting attorney was arguing was that such factors did not exist or should not be deemed mitigating. Moreover, while the jury found that none of the statutorily enumerated mitigating circumstances existed, it did find that four of the defendant's asserted nonstatutory mitigating circumstances existed.

the course of robberies or attempted robberies, cites fourteen such cases, and points out that in seven the sentencing authority determined that the appropriate punishment was life imprisonment, in three the jury was unable to agree and thus sentences of life imprisonment were imposed, and in four the sentencing authority imposed death. The defendant argues "that this case cannot be distinguished from the majority of robbery murder cases where the death penalty was sought but not imposed." (Brief, p. 46).

Although we have reviewed the cases cited by the defendant, we perceive no useful purpose in setting them out seriatim, with some particular facts included about each case and each defendant. When comparing the instant case with any one of the fourteen, or any one of the fourteen with another, both similarities and differences can be found.

As shown by the facts set forth in the beginning of this opinion, the defendant committed a brutal crime for personal gain. She plotted the crime in advance, obtained the assistance of her juvenile daughter, and sought the assistance of her daughter's friend. Before, during, and after the murder she proceeded methodically, not deviating from her plan. She attempted to blame the murder on her husband and, at another time, on her daughter. Mrs. Foster had previously been convicted of attempted armed robbery. Considering the crime and the defendant, we do not believe that the sentence in this case is disproportionate to the sentences in other cases involving murder and robbery. *See,* in particular, *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985); *White v. State,* 300 Md. 719, 481 A.2d 201 (1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985).

JUDGMENT AFFIRMED.

COLE, J., concurs.

COLE, Judge, concurring:

I agree with the judgment and with all parts of the Court's opinion except Part III, which deals with impeach-

ment of an absent witness' credibility. My initial objection is that the Court addresses the issue at all, since it was not preserved for appellate review. More particularly, I object because assuming the issue is preserved, the Court's analysis and resolution of it is incorrect under present Maryland law.

In this case the defendant sought to impeach the prior testimony of an absent witness by producing the record of a 1983 Delaware conviction for harboring and contempt of court. The defendant moved to redact that part of the record which showed the dispositions of the convictions, which in each case was a $25.00 fine. The State maintained that the entire document should be admitted. The trial court, while doubting whether the crimes were of an impeaching nature and admissible at all, nevertheless indicated that based "on fairness," it would admit the dispositions as well as the convictions. Later on in the trial, by agreement of counsel and on motion of defense counsel, the entire record of the witness comprising both convictions and fines was admitted without objection.

Under this factual backdrop, as I see it, no issue regarding admissibility of the record of the witness remains for appellate review. Our cases make clear that a prior objection is waived when the entire record of conviction is introduced by the objecting party or by agreement of all counsel. *Tichnell v. State,* 287 Md. 695, 715–716, 415 A.2d 830, 841 (1980). The issue is no longer viable.

Despite this posture of the case, the majority takes this opportunity, on these facts, to announce that Maryland adheres to the proposition that the punishment for a crime is admissible to impeach. I fail to see how the majority can reconcile this holding on these facts with Maryland law.

First of all, our decisions show that only certain crimes may impeach. *See Ricketts v. State,* 291 Md. 701, 436 A.2d 906 (1981); *State v. Huston,* 281 Md. 455, 379 A.2d 1027 (1977); *Cousins v. State,* 230 Md. 2, 185 A.2d 488 (1962); *Burgess v. State,* 161 Md. 162, 155 A. 153 (1931); *Nelson v.*

*Seiler,* 154 Md. 63, 139 A. 564 (1927). In *Ricketts,* we said that "while infamous crimes, felonies, crimes involving moral turpitude, deceit, or dishonesty are not the only types of crimes which are admissible for purposes of impeachment, lesser crimes, to be admissible, must tend to show that the person charged is not to be believed under oath." 291 Md. at 708, 436 A.2d at 910. It is clear to me, as it was to the trial judge, that neither harboring nor contempt of court is an impeaching crime. We further said, "where there is no way to determine whether a crime affects the defendant's testimony simply by the name of the crime that crime should be inadmissible for purposes of impeachment." *Id.* at 713, 436 A.2d at 913. Certainly harboring and contempt of court are so vague and ill-defined as not to suggest the conduct which reflects on the witnesses's credibility. It is clear to me that if these crimes do not impact upon credibility, then punishment for them is irrelevant.

But more important, it seems obvious that the punishment received for criminal behavior is immaterial no matter what the underlying crime. We suggested this in *Ricketts* when we said, "The only details ordinarily allowed to be presented to the jury [when using a prior connection to impeach] are the nature of the charge and the fact of conviction." *Id.* at 703, 436 A.2d at 907. The reason for this limitation is obvious. By restricting the impeaching crimes to that conduct which is commonly understood to impact upon credibility, we avoid any undue prejudice to the witness and minimize the extent to which the jury is caused to speculate as to what the criminal behavior was.

On the other hand, the fact that a witness received a certain punishment causes the jury to speculate. The fact finder does not know what variables the sentencer considered. It is generally understood that punishment for the same crime for defendants of similar backgrounds differs radically from county to county and from judge to judge. I see no assistance to the jury (in determining the believability of a witness) in knowing that the witness was in jail for a long or short time or was released on parole or probation.

If anything, such evidence compounds the difficulty a jury would have in assessing the witness's trustworthiness. The Supreme Court of Michigan in *People v. Rappuhun,* 390 Mich. 266, 273, 212 N.W.2d 205, 208 (1973) stated the proposition rather succinctly:

"It is the prior conduct undertaken by the accused and not the ensuing punishment, which is relevant. *Moreover, sentences for the same offense vary from tribunal to tribunal and judge to judge.*" [Quoting lower court's opinion, 26 Mich.App. 35, 39–40, 181 N.W.2d 803, 805–06.] [Emphasis supplied.]

\*       \*       \*       \*       \*       \*

The length of sentence, the conditions under which served and so on ... are not defendant's conduct but an uncertain sequel. It is defendant's conduct that is relevant and by which his credibility may be tested.

The majority cites several Maryland cases in support of its position decided at the turn of the century. In my opinion none of these cases can withstand critical analysis under present law.