## THE MACKE COMPANY *v.* STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

[No. 83, September Term, 1971.]

*Decided January 13, 1972.*

122

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Richard W. Case,* with whom were *Michael A. Pretl* and *Smith, Somerville & Case* on the brief, for appellant.

*E. Stephen Derby, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The principal question presented to us in this appeal is whether certain vending machines of The Macke Company, the appellant (Macke), which mix and dispense hot and cold drinks, are "used in manufacturing" so as to qualify Macke, as their owner, for an exemption from the personal property tax pursuant to Code (1969 Repl. Vol.) Art. 81, § 9 (23).

The facts are not in dispute. Macke, a Delaware Corporation, has its principal place of business in Cheverly, Maryland. Its primary business is providing food services on sites owned by others. In the course of its business, it maintains and operates conventional vending machines, hot and cold beverage vending machines, and catering facilities at various locations in Maryland, Virginia and the District of Columbia. In Maryland, Macke operates machines and conducts business in seven counties, *i.e.,* Prince George's, Montgomery, Calvert, Charles, Howard, Anne Arundel and St. Mary's.

Macke employs several hundred persons in Maryland. Its payroll for Maryland employees for the year ending June 30, 1970, was $4,641,103.74.

As of January 1, 1968, Macke owned in Maryland 175 hot "post-mix" vending machines and 171 cold "post-mix" machines. These machines cost $509,727 and had a combined book value of $199,441. A year later, Macke had holdings in Maryland of 274 hot drink machines and 212 cold drink machines which cost $677,657 and were valued on its books at $278,409. Macke employed eight persons full time to service these machines and 42 other part-time employees for this purpose.

In 1968 and again in 1969, Macke protested the assessment of the appellee, State Department of Assessments and Taxation (Department), of the value of the hot and cold machines as subject to personal property taxes, contending that these machines were exempt from taxation since their function was the manufacture of a product. At the hearing before the Maryland Tax Court, the testimony and exhibits in regard to the operation of the cold and hot "post-mix" machines indicated the following.

### Cold Drink Machines

Although there are several different models of cold drink machines dispensing various flavors, the operation of all of them is substantially the same. They automatically prepare and deliver to the customer carbonated and non-carbonated drinks in cups. The ingredients of the cold drinks are carbon dioxide, refrigerated water, syrup and ice. Each ingredient is stored in a compartment within the machine. Usually there are four tanks of different syrups, any one of which can be mixed automatically with the other ingredients to produce the desired flavor of drink either carbonated or without carbonation.

The cold drink machine is connected to a water pipe in the building in which the machine is located. This pipe supplies the water used in making carbonated water and ice. There is a constant supply of electricity necessary to operate the water pump and the refrigeration of the machine. A hydraulic pump is used to convey water to the carbonating unit. The refrigeration unit cools water to a constant temperature and also makes ice.

The customer places a coin in the machine and this activates a vend switch. The vend switch then energizes a credit relay completing a circuit to selection buttons on the front panel to enable the customer to make his choice of flavor and type of drink. When a selection button is pressed, electronic circuits are set up and a series of solenoid valves are opened in a programed sequence through one full cycle.

When the cycle begins, the cup delivery motor operates the dispenser unit and a cup is automatically delivered to a position in the recessed portion of the front panel to receive the cold drink. If the customer elects to receive a carbonated drink of a certain flavor, the carbonated water valve, the ice dispenser motor and the syrup pump motor are then energized by a switch on cams operated by a cycle timer. When the proper amounts of carbonated water, ice and syrup have been dispensed, the respective cams release the switches closing the water solenoid and stopping the syrup pump and the ice dispenser motors. When the cycle ends, switches are released through cam action to open the circuit to circuits previously energized so that the unit is then ready for the next cycle.

If the customer elects to receive a drink without carbonation, he pushes the appropriate button so that carbon dioxide is not added by the control mechanism.

### Hot Drink Machines

Hot drink machines prepare coffee, tea, chocolate and soup and dispense these products to the customer. Some of these machines brew one cup of coffee at a time; others brew 11 cups of coffee, storing them in a pot. Here again, the basic operation of all of the machines is substantially the same. The ingredients used in the coffee vendors are regular ground coffee, water, powdered cream and granulated sugar. The ingredients for the tea, chocolate and soup are present in powdered or undiluted form. Each ingredient is stored in a separate compartment which is controlled individually by portion dispensers.

Here again, the machine is connected to a water pipe in the building in which it is placed. The incoming water passes through a filter, a strainer and a water solenoid or electromagnetic hydraulic valve.

The cycle is similar to that in the cold drink machine. The customer inserts a coin which activates a vend switch. This in turn energizes a credit relay completing a circuit to selection buttons on the front panel. When the customer has made his selection, electrical circuits are set up and the machine operates through a complete cycle. This cycle begins when a delivery motor dispenses a cup automatically to a position in a recessed portion of the front panel to receive the hot drink. Then a cycle timer programs the sequence of the operation of the coffee brewer and dispenser (assuming coffee is the hot drink selected), compounding the ingredients selected by the customer on the push-button panel.

In brewing a cup of coffee, a predetermined amount of the regular ground coffee is dispensed into the brewing compartment, upon which the lid automatically closes. Then, an air pump begins to operate forcing six ounces of preheated water through the brewing compartment. The mixture of coffee and hot water then passes through screens and filters to the mixing bowl where it may be mixed with cream, with cream and sugar or with sugar only, depending upon which buttons the customer has pushed on the front panel. Near the end of the cycle, switches are released by cam action to open the circuits previously energized, thereby uncovering the brewing compartment and emptying any coffee grounds into a waste container within the machine itself.

Merrill Krakauer, General Manager and Vice President of Macke, testified on behalf of Macke at the hearing in the Maryland Tax Court. He qualified as an expert in the operation of vending machines. In addition to facts already given in regard to the operation of the cold drink and hot drink machines, he testified, without contradiction, that none of the ingredients used in either of the machines, with the exception of water, was palatable in

the form in which Macke purchased them and prior to going through the machine's cycle. He also testified that the machines used by Macke are not produced by it, but are purchased from other companies, and further that the mechanisms which control the operation of the cold drink and hot drink machines had not changed materially during the last 30 years although these mechanisms are now more complex, more sophisticated and result in more reliable and better control than the older mechanisms.

John J. Raul, who has been an assessor in the Department for some 25 years and whose sole duties during that time have been in connection with the assessment of personal property, testified, without contradiction, that, in administering the applicable tax law, the Department, without exception, has assessed for personal property taxation the type of vending equipment for which Macke is claiming an exemption and that no company owning such machines has ever been granted an exemption for such machines.

The Maryland Tax Court on appeal to it from the action of the Department in assessing the machines in question for personal property taxation affirmed the action of the Department. In its carefully considered opinion, the Maryland Tax Court affirmed for essentially two reasons, *i.e.*, (a) that the machines were not "used in manufacture" within the meaning of those words in Art. 81, § 9 (23), as interpreted by us and our predecessors, and (b) that, in any event, Macke was not shown to be the *user* of the alleged manufacturing equipment, a prerequisite for the claimed exemption by our decision in *Pan American Sulphur Co. v. State Department of Assessments and Taxation*, 251 Md. 620, 625-29, 248 A. 2d 354, 357-59 (1968), *reh. denied* Jan. 7, 1969.

On an administrative appeal by Macke to the Circuit Court for Prince George's County from the adverse decision of the Maryland Tax Court, the circuit court (McCullough, J.) affirmed the decision of the Maryland Tax Court. A timely appeal from that action by the circuit court was taken by Macke to this Court.

The same two questions which the Maryland Tax Court considered are presented to us. Inasmuch as we agree with the Department on the first question, we do not find it necessary to decide the second one in regard to whether or not Macke is a *user* of the alleged manufacturing equipment.

Art. 81, § 8 of the Code (1969 Repl. Vol.) provides, in relevant part, that:

> "The following property, except as in §§ 9 and 10 provided, shall be subject to assessment to the owner * * * and taxation for ordinary taxes * * *:"
>
> * * *
>
> "(2) Tangible personal property.—All tangible personal-properties located in this State, by whomsoever owned, * * *."

Art. 81, § 9 provides in pertinent part:

> "The following shall be exempt from assessment and from State, county and city taxation in this State, *each and all of which exemptions shall be strictly construed:*"
>
> * * *
>
> "(23) *Tools, implements, etc., used in manufacturing or farming.* — Tools (including mechanical tools), implements, whether worked by hand, steam or other motive power, *machinery, manufacturing apparatus or engines used in manufacturing*, whether temporarily idle or not, in any county or city, as herein defined (including the City of Baltimore), whether exempted by the county in which said city is located or not, in any political subdivision in which by law, resolution or ordinance the same are or may be exempt from county or city taxation; and the county commissioners of any county and any city, as herein defined, including the mayor and city council of Baltimore, are hereby authorized

to pass such resolution or ordinance. * * * Notwithstanding the provisions of this subsection, tools (including mechanical tools), implements, whether worked by hand, steam, or other motive power, *machinery, manufacturing* or farming *apparatus, or engines, used in manufacturing* or farming, whether temporarily idle or not, are exempt from State taxation."
(Emphasis supplied.)

The word "manufacture" is a word of broad meaning as appears from its definition in *Webster's New International Dictionary*, 2nd Edition, unabridged, page 1499:

"manufacture, *n.*

* * *

"2. The process or operation of making wares or any material products by hand, by machinery, or by other agency; often, such process or operation carried on systematically with division of labor and with the use of machinery.
"3. Anything made from raw materials by the hand, by machinery, or by art, as cloths, utensils, machinery, etc."

The question arises in regard to what meaning the General Assembly intended to give the words "machinery, manufacturing apparatus or engines used in manufacturing" in § 9 (23).

We, and our predecessors, have passed upon this question in a number of cases and the meaning intended by the General Assembly to be given these words has been judicially determined.

In our prior decisions, this Court has considered the following factors in determining whether or not a particular operation was "manufacturing" in the sense that the Legislature intended, bearing in mind the purpose and object of the exemption:

(1) The scale and character of the operation, includ-

ing the number of employees, *Baltimore v. Hanover Shirt Co.,* 168 Md. 174, 177 A. 160 (1935) ; *Baltimore v. State Tax Commission,* 161 Md. 234, 155 A. 739 (1931) ; *Carroll County v. B. F. Shriver Co.,* 146 Md. 412, 126 A. 71 (1924) ; *Frederick Elec. Light Co. v. Frederick City,* 84 Md. 599, 36 A. 362 (1897). See also *H. M. Rowe Co. v. State Tax Commission,* 149 Md. 251, 131 A. 509 (1925).

(2) The common understanding of the word, *Frederick Elec. Light Co. v. Frederick City, supra;* for example, one would not ordinarily think of manufacturing a street, *State Tax Commission v. Baltimore Block and Tile Co.,* 180 Md. 620, 26 A. 2d 371 (1942) or manufacturing a house, *Comptroller of Treasury v. Crofton Co.,* 198 Md. 398, 84 A. 2d 86 (1951). See also *Suburban Propane Gas Corp. v. Tawes,* 205 Md. 83, 106 A. 2d 119 (1954) ; *Arnreich v. State of Maryland,* 150 Md. 91, 132 A. 430 (1926) ; *Carlin v. Western Assurance Co.,* 57 Md. 515 (1882). For a thorough review of cases in this area, see 17 A.L.R.3d 7, *What Constitutes Manufacturing And Who Is A Manufacturer Under Tax Laws.* See also 51 Am. Jur. *Taxation* § 591-99, pp. 576-83; 84 C.J.S. *Taxation* § 273-75, pp. 516-24.

Macke relies on *Canteen Co. v. Bowers,* 167 Ohio St. 337, 40 Ohio Ops. 2d 460, 148 N.E.2d 684 (1958), in which Canteen's hot and cold "post-mix" beverage machines were held entitled to a lower assessment for tax purposes in a brief per curiam opinion by the Ohio Supreme Court. However, we find the Ohio Statute (Revised Code of Ohio, sec. 5711.16) of broader scope than the Maryland provision. The Ohio law defines a manufacturer as "a person who purchases, receives, or holds personal property for the purpose of adding to its value *by manufacturing, refining, rectifying, or combining different materials* with a view of making a gain or profit by so doing." (Emphasis supplied.)

Further, although *Canteen Co.* provides no rationale for its holding, in *Allen V. Smith, Inc. v. Bowers,* 170 Ohio St. 398, 401, 11 Ohio Ops. 2d 124, 126, 165 N.E.2d 638, 640 (1960) it was stated:

"Thus, in *Middletown Iron and Steel Co. v. Evatt, supra,* (139 Ohio St. 113, 38 N.E.2d 585, 138 A.L.R. 426) change of form sufficed to cause the court to conclude that a taxpayer who rebuilt unsaleable machine tools was a manufacturer, and *change of form plus the combination of ingredients* sufficed for the same result in * * * *Canteen Co. v. Bowers,* 167 Ohio St. 337, 148 N.E.2d 684."
(Emphasis supplied.)

See also *Roberts v. Bowers,* 170 Ohio St. 99, 10 Ohio Ops. 2d 1, 162 N.E.2d 858 (1959).

Macke also relies on a Michigan Board of Tax Appeals decision, *Vending Machine Corp. of America v. Dep't of Revenue,* 17 CCH State Tax Rep., Mich., § 200-021 (1950); however, the issue in that case was whether appellant's vending machines were being used in "industrial processing" under Michigan law.

By the Laws of 1914, ch. 528, the Legislature passed an Act, approved April 13, 1914, "to encourage the development of manufacturing industries in the State of Maryland, by providing for exemption from taxation of the tools, machinery, manufacturing implements and engines of corporations, firms and individuals actually engaged in manufacturing," and providing that this exemption shall be strictly construed.

By the Laws of 1929, ch. 226, effective June 1, 1929, the Legislature enacted a comprehensive revision of the Maryland Tax Laws based upon the Recommendations of the Tax Revision Commission appointed by then Governor Albert C. Ritchie. The language of present § 9 in regard to exemptions, that they "shall be strictly construed," and the language of present subsection (23), "machinery, manufacturing apparatus or engines used in manufacturing," has remained the same (with one change, repealed the next session) since the enactment of the Laws of 1929, ch. 226, even though § 9 (or its predecessor sections) has been amended by the General

Assembly 165 times since its original enactment in 1929 —indeed at *every* regular session and at two special sessions. Subsection (23) (or its predecessor subsections) has been specifically amended seven times since its original enactment, *i.e.*, by the Laws of 1945, ch. 776, the Laws of 1951, ch. 321, the Laws of 1955, ch. 527 and ch. 658, the Laws of 1963, ch. 475, the Laws of 1964, ch. 28, and by the Laws of 1965, ch. 702, which principally made additions to subsection (23) in regard to its operation in various political subdivisions, but with one elimination of language inserted subsequent to the original enactment.

In the original enactment, there was no provision in the "definition" section—§ 2—in regard to the word "manufacturing." By the Laws of 1965, ch. 94, approved March 11, 1965, and effective on June 1, 1965, a new subsection (25) to § 2 of Art. 81 was added and reads as follows:

> "(25) The word 'manufacturing' includes, without limitation, the operation of sawmills, grain or féed mills, and of machinery and equipment used in the extraction and processing of minerals, metals, or any earthen materials and/or by-products resulting from such extraction or processing."

It will be observed that this 1965 addition to the "definitions" section of Art. 81 does not purport to define or redefine the meaning of the word "manufacturing" as used in the original Act of 1929 but merely gives that word an *inclusion* of certain operations. The 1965 addition suggests that the General Assembly was satisfied with—or at least acquiesced in—the prior general judicial interpretation of the word "manufacturing," but wished to insure that certain operations be included within its meaning. This is significant in view of our holding that the General Assembly legislates in the light of prior judicial construction of legislation then subject to legislative consideration; and if that prior judicial construc-

tion is not disturbed by the amendment of the existing legislation, as so construed, under consideration, but is re-enacted, the General Assembly is deemed to have acquiesced in the prior judicial interpretation as expressing the legislative intent. *Stack v. Marney*, 252 Md. 43, 248 A. 2d 880 (1969) and cases therein cited. See *Mayor and City Council of Baltimore v. Seabolt*, 210 Md. 199, 123 A. 2d 207 (1956). See also *Crest Investment Trust, Inc. v. Cohen*, 245 Md. 639, 227 A. 2d 8 (1967) applying the same rule of statutory construction when a published opinion of the Attorney General construing legislation was involved.

In the light of the re-enactment of subsection (23) without any change in the language in question as construed by us and by our predecessors and particularly of the enactment of the Laws of 1965, ch. 94, we proceed with assurance that the judicial construction of the language involved does indeed represent the legislative intent.

It is inevitable, in view of the scope of the word in question, as construed by this Court, that there will be borderline factual situations for our determination. In these situations, the legislative mandate that the exemptions be "strictly construed" and the prior decisions of this Court to the same effect—see *Pan American Sulphur Co. v. State Department of Assessments and Taxation*, 251 Md. 620, 629, 248 A. 2d 354, 359 (1968) *supra*, and cases therein cited—require us to deny the claimed exemption, bearing in mind that if "there is a real doubt upon the subject, that doubt must be resolved in favor of the State."

We "have a real doubt" that the mechanical devices within Macke's cold and hot drink vending machines are "used in manufacturing" as judicially defined in the prior decisions of this Court. We now consider the various factors which lead us to this conclusion.

First of all, in our opinion, the average man would not think of the vending machine operation as "manufacturing." True, there are certain aspects of the mechanical

134

and electrical operations of the vending machine which can fit into various aspects of definitions of the word "manufacturing." But the over-all view of the operation would be—in the popular sense—predominantly a vending, rather than a manufacturing, operation. The mechanical and electrical operations of the machines in question are sophisticated and somewhat complicated; but the *essential* operations are *basically* the same as those used in vending machines 25 or 30 years ago, as the uncontradicted testimony indicates.

The regular ground coffee when hot water is added to it has been made a liquid for drinking and sale, but it is still coffee. The adding of water, as well as sugar and cream, is little different in result from the operation of the housewife at breakfast using regular ground coffee in a percolator for her family. The mixing of water, ice and the syrup selected by the purchaser is little different in principle from the operation of the soda fountains where the operator of the fountain, in less sophisticated days, would add ice and carbon dioxide produced at the fountain by a local device into the syrup selected by the purchaser. We would agree that the appellant's operation is *mechanized;* but the average person would not, in our opinion, consider these operations as "manufacturing."

Secondly, although Macke's entire operation involves a substantial number of employees and a substantial payroll, the evidence indicates that of the 50 employees concerned with servicing and maintaining the cold drink and hot drink machines, only eight employees are so employed full time and the remaining 42 employees are employed only part time in this work. We do not mean to imply that the number of persons employed in the operation and maintenance of the machine claimed to be "used in manufacturing" is, in itself, a determining factor; but in view of the economic policy underlying the granting of the exemption, it is an important factor to be considered. The relatively small number of employees involved full time and with no showing by the taxpayer-claimant of the amount of time spent by the part-time employees, in-

creases our doubt that the vending machine apparatus is "used in manufacturing."

If the language in question is thought to be ambiguous, we give weight to the long standing administrative interpretation of the language for at least the past 25 years as not applying to the machinery and operation involved in the instant case. *Swarthmore Company v. Kaestner,* 258 Md. 517, 528-29, 266 A. 2d 341, 346-47 (1970) and cases therein cited.

For all of these reasons, we have concluded that Macke has not established that its machines are "used in manufacturing" and hence the lower court properly ruled in denying the claimed exemption.

As we have stated, in view of our conclusion on the first question, we do not find it necessary to decide the second reason urged by the Department for a denial of the exemption, *i.e.,* that, in any event, Macke was not the "user" of the machines "in manufacturing" within the meaning of our decision in *Pan American Sulphur Co. v. State Department of Assessments and Taxation,* 251 Md. 620, 248 A. 2d 354 (1968), *supra.*

*Order of April 21, 1971, affirmed, the appellant to pay the costs.*