800 A.2d 757

Patrick M. PLEIN

v.

DEPARTMENT OF LABOR, Licensing and Regulation.

No. 116, Sept. Term, 2001.

Court of Appeals of Maryland.

June 12, 2002.

Lewis S. Yelin, Baltimore, Richard I. Martel, Jr., Arbutus (Deborah Thompson Eisenberg and Debra Gardner), Baltimore, for petitioner.

Gina M. Serra, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., and Andrew H. Baida, Solicitor Gen.), Baltimore, for respondent.

Susan Tannenbaum, Esquire, Ruben G. Ballesteros, Esquire, Towson, Md., brief of Amicus Curiae, Legal Aid Bureau, Inc. for petitioner.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

The issue this case presents is whether the decision of a divided Court, in *Total Audio–Visual Systems, Inc. v. Department of Labor, Licensing and Regulation*, 360 Md. 387, 758 A.2d 124 (2000), should be reconsidered and overruled. Having granted the petition for certiorari filed by Patrick M.

Plein, the appellant, while the appeal was pending in the Court of Special Appeals, *see* 367 Md. 722, 790 A.2d 673, 2002 Md. LEXIS 55 (2002), and considered the arguments presented at oral argument, we decline the invitation, joined in by the appellee, Department of Labor, Licensing and Regulation, which argues, consistent with its position in that case, that *Total Audio–Visual* was wrongly decided, to overrule that decision and, instead, reaffirm it.

In *Total Audio–Visual,* this Court considered "whether, under the Labor and Employment Article, an employee is entitled to unemployment benefits on the basis of his or her employment with a previous employer where that employee voluntarily resigned a permanent and satisfactory job with that previous employer in order to take a job with another employer," 360 Md. at 390, 758 A.2d at 125, concluding that, under the circumstances of that case, the employee was not. *Id.* That conclusion was dictated by our interpretation of Maryland Ann.Code Lab. & Empl.[1] § 8–1001(1991, 1999 Repl. Vol.) and, in particular, the phrase "good cause," as therein used.

Section 8–1001, in its entirety, provides:

"(a) *Grounds for disqualification.*—(1) An individual who otherwise is eligible to receive benefits is *disqualified* from receiving benefits *if the Secretary finds that unemployment results from voluntarily leaving work without good cause.*

(2) A claimant who is otherwise eligible for benefits from the loss of full-time employment may not be disqualified from the benefits attributable to the full-time employment because the claimant voluntarily quit a part-time employment, if the claimant quit the part-time employment before the loss of the full-time employment.

(b) *Finding of good cause.* The Secretary may find that a cause for voluntarily leaving is good cause *only* if:

---

1. All future reference to sections in the Labor and Employment Article refer to the 1999 Replacement Volume, unless otherwise stated.

(1) *the cause is directly attributable to, arising from, or connected with:*

    *(i) the conditions of employment; or*

    *(ii) the actions of the employing unit; or*

(2) an individual:

    (i) is laid off from employment through no fault of the individual;

    (ii) obtains subsequent employment that pays weekly wages that total less than 50% of the weekly wage earned in the employment from which the individual was laid off; and

    (iii) leaves the subsequent employment to attend a training program for which the individual has been chosen that:

    1.  is offered under the Maryland Job Training Partnership Act; or

    2.  otherwise is approved by the Secretary.

(c) *Valid circumstances.*—(1)  A circumstance for voluntarily leaving work is valid *only* if it is:

    (i) a *substantial cause* that is directly attributable to, arising from, or connected with conditions of employment or actions of the employing unit; or

    (ii) of such *necessitous or compelling nature* that the individual has *no* reasonable alternative other than leaving the employment.

(2) For determination of the application of paragraph (1)(ii) of this subsection to an individual who leaves employment because of the health of the individual or another for whom the individual must care, the individual shall submit a written statement or other documentary evidence of the health problem from a hospital or physician.

(d) *Required disqualification.*—in addition to other circumstances for which a disqualification may be imposed, neither good cause nor a valid circumstance exist and a disqualification shall be imposed if an individual leaves employment:

(1) to become self-employed;

(2) to accompany a spouse to a new location or to join a spouse in a new location; or

(3) to attend an educational institution"

(emphasis added).

Noting that § 8–1001(b) was the applicable section because it was there that the Legislature defined "good cause" in terms of two permitted and definitive findings, 360 Md. at 397, 758 A.2d at 130, and the rules of statutory construction that we determined to be relevant, *id.* at 395, 758 A.2d at 128, we concluded that "[a] plain reading of § 8–1001 makes clear that leaving employment for a better paying job does not constitute "good cause." *Id.* Focusing on the difference between subsection (b)(1), which permits a finding of good cause only when the reason for voluntarily leaving employment " 'is directly attributable to, arising from, or connected with' either a condition of employment or an action of the employment unit,' " *id.*, and subsection (b)(2), in which the triggering event is the employee's being laid off without fault, *id.*, we reasoned that "good cause must be found, if at all, under subsection (b)(1)." *Id.* at 398, 758 A.2d at 130.

Analyzing subsection (b)(1), we said:

"Under subsection (b)(1), to be good cause, the reason for voluntarily leaving employment must be job related, see *[Board of Educ. of Montgomery County v.] Paynter,* supra, 303 Md. [22] at 29, 491 A.2d [1186] at 1189–90 (1985), and more particularly, relate to the conditions existing on the claimant's job or involve acts by the claimant's employment unit. See § 8–1001(b)(1). An offer of greater pay by another employer to induce the claimant's voluntary termination does not qualify; because such offers are conditions of the offered employment and thus only relate to the conditions of the future employment. Although, to be sure, while affecting employment conditions generally, and, perhaps, the claimant's employment in some way, they surely are not "directly attributable to, arising from or connected with" the conditions existing in the employing unit from

which the claimant resigned. If an offer of greater pay can be "good cause" for an employee voluntarily to terminate otherwise satisfactory employment, then any condition of future employment which compares favorably with the claimant's present employment and is offered and accepted, as an inducement to the claimant to leave that employment, must also be considered "good cause."

360 Md. at 398, 758 A.2d at 130. In *Paynter*, this Court construed the predecessor to that section, Maryland Ann.Code art. 95A, § 6 (1957, 1979 Repl.Vol.).[2] It concluded that art. 95, § 6(a) was unambiguous, "command[ed] that good cause be job related," and recognized as an alternative valid circumstance for voluntarily leaving work, one "of such necessitous or compelling nature that the individual had no reasonable alternative other than to leave the employment." 303 Md. at 29–30, 491 A.2d at 1190.

Relying on *Paynter* for confirmation of the interpretation given § 8–1001(a), the *Total Audio–Visual* Court was persuaded by the fact that the statutory scheme, as reflected in § 8–1001, remained as it was when *Paynter* was decided. 360 Md. at 400, 758 A.2d at 131. Section § 8–1001(c), like art. 95, § 6(a) before it, we pointed out, places circumstances for voluntarily leaving work into two categories, thus, drawing a

---

**2.** Maryland Ann.Code art. 95A, § 6, as relevant, provided:

"(a) If the Executive Director ... finds that the individual's unemployment is due to his leaving work voluntarily without good cause. Only a cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer may be considered good cause.... Leaving work to become self-employed, to accompany or join one's spouse in a new locality, or to attend an educational institution is neither good cause nor a valid circumstance for voluntarily leaving work. Only a substantial cause which is directly attributable to, arising from, or connected with the conditions of employment or actions of the employer, or another cause of such a necessitous or compelling nature that the individual had no reasonable alternative other than to leave the employment may be considered a valid circumstance...."

Md. Ann.Code art. 95A, § 11(a) (1957, 1979 Repl.Vol., 1984 Cum. Supp.) directed that "[w]herever in this article the word 'Executive Director' appears, it shall be construed to mean the Secretary of Employment and Training."

distinction between those that are work related and those that are not work related. Therefore, we opined: "[n]ot being directly related to, attributable to or connected with the employee's employment or the actions of that employing unit, offers of higher pay as an inducement to leave existing employment must fall, if at all, into this latter category," *id.* at 401, 758 A.2d at 131, that is, they must meet the "necessitous and compelling" test. *Id.* Under that stricter test, we reiterated, "more needs to be shown than that the precipitating event or cause " " 'would reasonably [have] impel[led] the average able-bodied qualified worker to give up his or her employment." ' " *Id.,* quoting *Paynter,* 303 Md. at 36–37, 491 A.2d at 1193, in turn quoting *Uniweld Products, Inc. v. Indus. Relations Comm'n, Etc.,* 277 So.2d 827, 829 (Fla.App. 4 Dist. 1973).

The Court also was persuaded by the absolute disqualifications prescribed in § 8–1001(d). In that regard, we noted:

"By denying unemployment benefits to employees who leave work to go into business, to relocate with a spouse or to go to school, that section makes clear that purely personal reasons for leaving work will not suffice as a predicate for unemployment benefits. It is difficult to reconcile, except on that basis—going into business for oneself is a personal matter—why the Legislature would permit an employee, who voluntarily terminates permanent and otherwise satisfactory employment for increased wages, on the theory that his or her prospects and financial condition are thereby improved, to be eligible for unemployment benefits, while at the same time denying the same right to a claimant, who, for the same reasons, voluntarily leaves work to go into business for him or herself. Accepting more money and changing jobs is as much of a gamble and thus, as much of a personal matter, as going into business for oneself. In our view, it is unmistakably clear that § 8–1001(a) was not designed to provide benefits when the precipitating cause for the voluntary leaving of the employment was for higher pay or a better job. Instead, it was designed to prevent

hardship to persons who lose their jobs, through no fault of their own." [3]

*Total Audio–Visual,* 360 Md. at 400–01, 758 A.2d at 131–32.

Finally, we found ·§ 8–611, especially the prohibition contained in subsection (e)(4), to be both instructive and consistent. *Id.* at 402, 758 A.2d at 132. We reasoned:

"Under § 8–611(e), . . . "[t]he Secretary may not charge benefits paid to a claimant against the earned rating record of an employing unit if . . . (4) the claimant left employment voluntarily to accept better employment or enter training approved by the Secretary." (Emphasis added). If, given the specific provisions of § 8–611(e)(4), the earned rating record of the employing unit which the claimant left voluntarily to accept better employment cannot be charged for the benefits payable as a result of a subsequent lay off, then it seems strange indeed that, as to that employing unit, leaving employment voluntarily to accept better employ-

3.  Section 8–102 of the Labor and Employment Article provides:

"(a) Interpretation and application.—This section is a guide to the interpretation and application of this title.

(b) Findings.—The General Assembly finds that:

(1) economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the State;

(2) involuntary unemployment is a subject of general interest and concern that requires appropriate action by the General Assembly to prevent the spread of involuntary unemployment and to lighten its burden, which often falls with crushing force on the unemployed worker and the family of the unemployed worker;

(3) the achievement of security for society requires protection against involuntary unemployment, which is the greatest hazard of our economic lives; and

(4) security for society can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, maintaining the purchasing power, and limiting the serious social consequences of poor relief assistance.

(c) Statement of policy.—The General Assembly declares that, in its considered judgment, the public good and the general welfare of the citizens of the State require the enactment of this title, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of individuals unemployed through no fault of their own."

ment would be considered good cause for leaving work. Thus, while, pursuant to § 8–1001(a), a claimant may be eligible for unemployment benefits, the determination whether those benefits should or may be paid is employer specific.[4] Reading § 8–1001(a) as the appellee proposes would render § 8–611(e)(4) meaningless. See, *Fraternal Order of Police, Montgomery County Lodge No. 35 v. Mehrling,* 343 Md. 155, 180, 680 A.2d 1052, 1065 (1996) ("[n]or should we interpret a statutory scheme so as to render any part of it meaningless or nugatory."),"

*id.* at 404, 758 at 133, and concluded:

"[the claimant] was not, at the time of his voluntary departure eligible for unemployment benefits because the claimant left his employment with the petitioner for other employment and, in fact, entered into that employment. Therefore, the [claimant] could not, at that time, have received unemployment benefits for the simple and inescapable reason that he was employed. That he subsequently becomes unemployed, and therefore eligible, because of the actions of the subsequent employer does not change the situation. The claimant's unemployment results from the subsequent employer's laying him off and not from the petitioner's actions. Rather, it was the claimant's inadvertent actions which led to his unemployment through the, perhaps very reasonable, acceptance of employment that supposedly paid better."

*Id.* at 405, 758 A.2d at 134.

The appellant in this case was employed by Atlas Tile & Terrazzo as a tile setter's helper, a job that paid $9.00 an hour. He accepted employment with Home Depot, U.S.A., at its

---

**4.** Section 8–611(b) expressly provides:

"Allocation of regular benefits.—Except as provided in subsection (d) of this section, the Secretary shall charge pro rata against the earned rating record of each base period employer all regular benefits and the share of extended benefits required under subsection (c) of this section in the same proportion as the wages paid by the base period employer is to the total wages of the claimant during the base period, and rounded to the nearest dollar."

Ellicott City store, as a sales associate in the floor and wall department. That job paid $12.00 an hour with the prospect of receiving, after a waiting period, a health insurance plan and stock purchase options and, after one year, two weeks vacation and sick leave. The appellant left his employment with Atlas and began working at Home Depot on August 14, 2000. On September 27, 2000, he was laid off, unexpectedly and through no fault of his own. His application for unemployment benefits was denied on the authority of *Total Audio–Visual*.

This case demonstrates, the appellant submits, the devastating impact that *Total Audio–Visual* has had on workers, "especially the working poor striving to pull themselves out of poverty and better their conditions of employment," a conclusion with which the Department of Labor, Licensing and Regulation (hereinafter "DLLR"), the appellee, takes no issue. For that reason, he strenuously argues for the overturning of *Total Audio–Visual*. In support of that result, the appellant offers a number of arguments. Although, as the appellant points out, the claimant's perspective was not represented in *Total Audio–Visual*, the claimant in that case having chosen not to participate in the appeal, many of the arguments he offers are not new ones. In fact, DLLR, the appellee in that case and the purported appellee here, made many of them in its attempt to uphold the decision to award unemployment benefits to the *Total Audio–Visual* claimant.

DLLR argued unsuccessfully in *Total Audio–Visual* that unemployment benefits were properly awarded in that case precisely because a claimant who leaves a position for other employment with similar responsibilities and substantially better pay has left with good cause under § 8–1001; that the Board's interpretation of § 8–1001 was consistent with the plain language of the statute, its legislative history, and the remedial nature of the Unemployment Insurance Law; and, citing *Paynter, supra,* 303 Md. 22, 491 A.2d 1186, as well as cases from other jurisdictions, that the Board's decision was consistent with the standards set by this Court addressing the issue whether leaving one's job to accept better employment is

a cause which would impel the average reasonable worker to leave his or her job. 360 Md. at 392, 758 A.2d at 127. Those arguments, repeated here by the appellant, are fortified by the claimant's perspective and perhaps more eloquently stated.

In addition, the appellant challenges the Court's use of § 8–611(e) as support for its interpretation of § 8–1001, contending that the Court's statement of the scope of § 8–611 conflated two concepts, namely, "whether the period of employment with the [first employer] may be used to calculate the claimant's unemployment benefits" and "whether those benefits are chargeable to the [first employer]," *Total Audio–Visual,* 360 Md. at 403, 758 A.2d at 132–33, to one, only the latter to which that section had any applicability. He also maintains that those sections are perfectly consistent, representing "the legislature's attempt to strike a correct, delicate balance in furtherance of the purposes of unemployment insurance, such as income security, economic stimulus and stability, welfare avoidance" and other goals.

In *Total Audio–Visual,* the Court equated leaving employment for other employment with better pay to leaving employment to become self-employed, a circumstance that we have seen is specifically excluded as providing good cause for voluntary termination of employment. We said, more particularly: "Accepting more money and changing jobs is as much of a gamble and thus, as much of a personal matter as going into business for oneself." *Id.* at 403, 758 A.2d at 132. The appellant takes issue with this comparison. Instead, he sees the issue as one involving competence. While the DLLR is competent to assess the relative ranking of jobs based on an evaluation of the wages and benefits each offers, the appellant submits, it has no such competence when it comes to business plans and prospects. Thus, he argues,

"allowing benefits to those who quit for a better job is very different from allowing benefits to every would-be entrepreneur who wants to start a new business. The former represents a manageable inquiry with an objective standard: was the second job better in terms of wages and benefits? The latter would supplant the function of agencies like the

U.S. Small Business Administration in providing income support to fledgling businesses."

Finally, the appellant disagrees with the *Total Audio-Visual* Court's interpretation of *Paynter*. The *Total Audio-Visual* Court determined that interpreting § 8–1001 as precluding a finding of good cause when an employee leaves otherwise satisfactory employment for employment paying higher wages was consistent with *Paynter's* good cause analysis. *See* 360 Md. at 400–01, 758 A.2d at 131–32. Using the same analysis, the appellant asserts that his decision to leave a small company paying a low wage and go with a national company, paying more and with the promise of future, excellent benefits, "is manifestly reasonable." He continues: "Indeed, for low-wage workers and their families, leaving low-paying jobs that do not provide benefits is not only reasonable, it is often necessary to provide for basic necessities and lift them out of poverty."

DLLR disagrees that § 8–1001(d) supports the interpretation of § 8–1001 to preclude benefits when a claimant leaves employment for better pay, contending that such an interpretation renders that subsection surplusage, such provision disqualifying employees who quit a job to become self-employed, to accompany a spouse to a new location or to attend an educational institution not being necessary. It explains:

> "The decision of these employees to leave their jobs has nothing to do with any 'actions of the employing unit,' § 8–1001(b)(1)(ii), but rather implicates, by necessity, the 'conditions of employment' prong of the disqualification statute. If the Legislature shared the Total Audio Visual majority's interpretation that prospective events such as 'future employment' lack the requisite relationship with 'the conditions existing on the claimant's job,' . . ., there would have been no need to specifically identify these three situations as causes or circumstances requiring disqualification for benefits. The General Assembly enumerated these situations, however, because it understood that each *is* 'directly attributable to, arising from, or connected with . . . the conditions of employment, § 8–1001(b)(1)(i), just not the type that

warrants unemployment compensation. The Legislature made a different policy judgment with respect to the decision to leave employment for a higher paying position."

Resolution of the case *sub judice,* as it was in *Total Audio-Visual,* 360 Md. at 393, 758 A.2d at 127, is a matter of statutory construction. As such, the Court's function, consistent with the cardinal rule of statutory interpretation, *see Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000) and the cases cited therein, is to discern and effectuate the intention of the Legislature. In *Total Audio–Visual,* this Court, albeit, and perhaps significantly so, a sharply divided one, determined, and held, that the General Assembly did not intend that a person who voluntarily terminates his or her otherwise satisfactory employment for other employment with better pay be eligible to receive unemployment benefits when laid off through no fault of his or her own by the subsequent employer. It is well settled that the Legislature is presumed to be aware of decisions of the Court of Appeals, *Giffin v. Crane,* 351 Md. 133, 154, 716 A.2d 1029, 1040 (1998); *Romm v. Flax,* 340 Md. 690, 698, 668 A.2d 1, 4 (1995); *Harris v. State,* 331 Md. 137, 150, 626 A.2d 946, 952 (1993); *State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9, 12 (1990); *Mayor and City Council of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984). Moreover, the Legislature has shown itself quite capable, and willing, to act decisively and swiftly when the Court does not accurately discern its intent or when it believes the Court has gotten it wrong. *See, e.g.,* 1995 Md. Laws 248, overruling, at the next legislative session, the effects of our decision in *Tandra S. v. Tyrone W.,* 336 Md. 303, 315, 648 A.2d 439, 445 (1994); *see also Langston v. Riffe,* 359 Md. 396, 405, 754 A.2d 389, 404 (2000).[5] Accordingly, the Legislature's inaction, to

---

**5.** For other examples of the Legislature reacting to our cases, see the following laws as well as the decisions that the General Assembly specifically enacted the laws to overturn: 2000 Md. Laws 230 (authorizing the Worker's Compensation Commission to order an offset or credit against an award for permanent partial disability for any vocational rehabilitation or temporary total disability benefits previously paid to a

the same extent to which it acts to effect a change in a statute that this Court recently has interpreted, in the process mischaracterizing the Legislature's intent, must be considered in that light.

In each of the last two legislative sessions, in 2001 and 2002, bills were introduced in the House of Delegates and the Senate to overrule this Court's decision in *Total Audio–Visual.* In 2001, introduced as HB 1038, in the House, by Delegate Busch, and cross-filed as SB 665, in the Senate, by

---

covered employee), overturning *Sealy Furniture v. Miller,* 356 Md. 462, 740 A.2d 594 (1999) and *Philip Electronics North v. Wright,* 348 Md. 209, 703 A.2d 150 (1997); 2000 Md. Laws 59 (clarifying the circumstances under which parties to a contract may agree to the payment of late fees), overturning *United Cable Television of Baltimore Limited Partnership v. Burch,* 354 Md. 658, 732 A.2d 887 (1999); 2000 Md. Laws 350 (clarifying the circumstances under which probation may be imposed, describing generally appropriate conditions of probation, and adding Howard, but not Anne Arundel, County to the list of counties in which home detention may be imposed as a condition of probation), responding to *Bailey v. State,* 355 Md. 287, 734 A.2d 684 (1999) (holding illegal a 24–month term of home detention imposed as a condition of probation on a defendant convicted in Anne Arundel County because the relevant criminal statute only authorized the use of confinement as a condition of probation in Charles, St. Mary's, Cecil, Harford, and Calvert Counties); 2000 Md. Laws 384 (clarifying the circumstances under which the decision of a local alcoholic beverage licensing board may be reviewed and expressly granting standing to challenge board decisions to holders of existing licenses), overturning *Edgewater Liquors v. Liston,* 349 Md. 803, 709 A.2d 1301 (1998); 2000 Md. Laws 569 (authorizing health maintenance organizations to receive subrogation or reimbursement from settlements and damages received by its members from third party tortfeasors), overturning *Riemer v. Columbia Medical Plan,* 358 Md. 222, 747 A.2d 677 (2000); 2000 Md. Laws 339 (abrogating the distinction between an accessory before the fact and a principal in a crime under certain circumstances), overturning *State v. Sowell,* 353 Md. 713, 728 A.2d 712 (1999); 2000 Md. Laws 131 (making medical bills and other documentation admissible in certain civil actions without live witness sponsorship or amplification), overturning *Shpigel v. White,* 357 Md. 117, 741 A.2d 1205 (1999); 2000 Md. Laws 152 (authorizing certain health care providers to withhold or withdraw treatment in accordance with an emergency medical services "do not resuscitate order" under certain circumstances), overturning *Wright v. Johns Hopkins Hospital,* 353 Md. 568, 728 A.2d 166 (1999); 2001 Md. Laws 657 (requiring in a criminal case in a circuit court that all changes of the trial date be made for good cause shown), responding

Senator Ruben, the legislation did not make it out of the Economic Matters Committee in the House or the Finance Committee in the Senate. Although gaining sponsors, the legislation fared no better in the 2002 session. HB 336 was introduced in the House by Delegates Sher, Barve, Hurson, Moe, Hubbard, Goldwater, Howard, Mandel and Grosfeld and, in the Senate, SB 257 was introduced by Senators Ruben, Della and Stone. HB 336 was withdrawn and SB 257 again received an unfavorable report in the Finance Committee. Being aware of this Court's decision in *Total Audio Visual* and given the legislative activity over the past two years—the consistent efforts to effect the overruling of that decision—, it is clear that the Legislature not only understands the issue and this Court's interpretation of § 8–1001, the critical legislative enactment, but, in the absence of legislative action to amend § 8–1001 to reflect a different interpretation, it is equally clear that the Legislature agrees with this Court's interpretation.

DLLR, in addition to supporting the appellant's position as a substantive matter, argues, relying on State v. *Green,* 367 Md. 61, 79, 785 A.2d 1275, 1285 (2001), that this Court "is not compelled to reaffirm *Total Audio–Visual,* as the rule of *stare decisis* is a flexible rather than rigid rule under which cases may be overruled when they are wrongly decided and contrary to established principles." The purpose of *stare decisis* to insure that people are guided in their personal and business dealings by prior court decisions, through the established and fixed principles they announce, is not undermined, it submits, because only DLLR's Board of Appeals would be affected by a decision overruling *Total Audio–Visual,* the employers not being chargeable, pursuant to § 8–611(e)(4), for benefits paid under circumstances there, and here, involved. DLLR concludes, in any event,

"The doctrine of stare decisis should yield and Total Audio Visual should be overruled because the Board's interpreta-

to *Goldring v. State,* 356 Md. 495, 740 A.2d 612 (1999) and *State v. Brown,* 355 Md. 89, 733 A.2d 1044 (1999).

tion of the unemployment insurance law is consistent with the language of the statute, its purpose and remedial nature, and its legislative history." .

We do not disagree that the rule of *stare decisis* is flexible and requires that a balance be struck between fixed and established rulings, for the sake of such rulings, and correct rulings and principles. Indeed, we have not hesitated in an appropriate case to strike that balance. The most recent occasion, as DLLR rightly acknowledges, was in *State v. Green*, 367 Md. 61, 785 A.2d 1275 (2001). In that case, we overruled *Cardinell v. State*, 335 Md. 381, 644 A.2d 11 (1994), which only a few years before had held for the first time that the State had a common law right of appeal in criminal cases. In overruling that case, we were sensitive to the *stare decisis* concerns, but recognized that the doctrine was not absolute. Acknowledging that our prior decisions are not lightly to be set aside " 'because it is advisable and necessary that the law should be fixed and established as far as possible, and the people guided in their personal and business dealings by established conclusions, not subject to change because some other judge or judges think differently,' " *Green*, 367 Md. at 79, 785 A.2d at 1285 (quoting *Townsend v. Bethlehem–Fairfield Shipyard, Inc.*, 186 Md. 406, 417, 47 A.2d 365, 370 (1946)), we reasoned:

> "Nevertheless, the rule of stare decisis is not an absolute. The United States Supreme Court has stated that "it is common wisdom that the rule of stare decisis is not an 'inexorable command.' " *Planned Parenthood v. Casey*, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992). This Court also has recognized that "it is sometimes advisable to correct a decision or decisions wrongly made in the first instance if it is found that the decision is clearly wrong and contrary to other established principles." *Townsend*, 186 Md. at 417, 47 A.2d at 370; *see also Hearst Corp. v. State Dep't of Assessments & Taxation*, 269 Md. 625, 643–44, 308 A.2d 679, 689 (1973) ("The doctrine of stare decisis, important as it is, is not to be construed as preventing us from changing a rule of law if we are convinced that the rule

has become unsound in the circumstances of modern life."
(quoting *White v. King,* 244 Md. 348, 354, 223 A.2d 763, 767
(1966)); *Greenwood v. Greenwood,* 28 Md. 369, 381 (1868)
("Previous decisions of this court should not be disturbed
... unless it is plainly seen that glaring injustice has been
done or some egregious blunder committed.")."

On the other hand, consistent with the Legislature's aware-
ness of our cases, we have been reluctant to overrule our prior
decisions where it is likely that the Legislature, by its inaction,
indicates its adoption, or at least acceptance, of the interpreta-
tion reflected in the opinion announcing the decision. This
principle was well stated by Judge Eldridge in *Jones v. State,*
362 Md. 331, 337–38, 765 A.2d 127, 130–31 (2001) (quoting
*Williams v. State,* 292 Md. 201, 210, 438 A.2d 1301, 1305
(1981)), in which he observed for the Court:

"The General Assembly is presumed to be aware of this
Court's interpretation of its enactments and, if such inter-
pretation is not legislatively overturned, to have acquiesced
in that interpretation. *Harden v. Mass Transit Adm.,* 277
Md. 399, 406, 354 A.2d 817 (1976). This presumption is
particularly strong whenever, after statutory language has
been interpreted by this Court, the Legislature re-enacts
the statute without changing in substance the language at
issue. *Harbor Island Marina v. Calvert Co.,* 286 Md. 303,
322–323, 407 A.2d 738 (1979); *Director v. Cash,* 269 Md. 331,
345, 305 A.2d 833 (1973) *cert. denied sub nom. Vucci v.
Boslow, Director, Patuxent Institution,* 414 U.S. 1136, 94
S.Ct. 881, 38 L.Ed.2d 762 (1974); *Macke Co. v. St. Dep't of
Assess. & Taxation,* 264 Md. 121, 132–133, 285 A.2d 593
(1972); *Stack v. Marney,* 252 Md. 43, 49, 248 A.2d 880
(1969). Under these circumstances, it is particularly inap-
propriate to depart from the principle of stare decisis and
overrule our prior interpretation of the statute. *White v.
Prince George's Co.,* 282 Md. 641, 657–658, 387 A.2d 260
(1978). *See also Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099,
32 L.Ed.2d 728 (1972).

To the same effect, *see, e.g., Shah v. Howard County,* 337
Md. 248, 256, 653 A.2d 425, 429 (1995); *Workers' Compensa-*

*tion Comm'n v. Driver and Parker,* 336 Md. 105, 120, 647 A.2d 96, 104 (1994); *Harris v. State,* 331 Md. 137, 152–153 n. 8, 626 A.2d 946, 953–954 n. 8 (1993); *Waddell v. Kirkpatrick,* 331 Md. 52, 60, 626 A.2d 353, 357 (1993); *United States v. Streidel,* 329 Md. 533, 551 n. 12, 620 A.2d 905, 914–915 n. 12 (1993); Forbes v. State, 324 Md. 335, 342–343, 597 A.2d 427, 430–431 (1991)."

*See also Baltimore City Police v. Andrew,* 318 Md. 3, 18 19, 566 A.2d 755, 762 (1989); *Frank v. Storer,* 308 Md. 194, 203–04, 517 A.2d 1098, 1102–03 (1986).

In the case *sub judice,* the parties and the amici curiae are concerned with the fairness and equity of § 8–1001, as interpreted by the *Total Audio–Visual* Court. But, as we have seen, the matter has twice been presented to the General Assembly for its correction. We have recognized that it is appropriate generally that the Legislature balance the equity or fairness of a particular statutory provision. *Philip Electronics v. Wright,* 348 Md. 209, 229, 703 A.2d 150, 159 (1997). That is particularly the case when, as here, the Legislature has been accorded the opportunity to address the issue and has declined to do so. Accordingly, although not the exact situation addressed in *Jones* and *Williams,* we believe this case falls under that rule and, so, we will decline the parties' invitation to overrule *Total Audio–Visual.* The Legislature remains an available avenue for redress, indeed, perhaps the only one.

JUDGMENT AFFIRMED, WITH COSTS.

ELDRIDGE, CATHELL and BATTAGLIA, JJ., dissent.

Dissenting opinion by CATHELL, J. in which ELDRIDGE and BATTAGLIA, JJ., join

Judges Cathell, Battaglia and Eldridge dissent for the reasons stated in Judge Cathell's dissent in *Total Audio–Visual Systems, Inc. v. Department of Labor, Licensing and Regulation,* 360 Md. 387, 758 A.2d 124 (2000).